**Thomas Harrison PROVENZANO,
Petitioner,**

v.

**Harry K. SINGLETARY,
et al., Respondents.**

**No. 93–523–CIV–ORL–18.**

United States District Court,
M.D. Florida,
Orlando Division.

March 3, 1997.

---

1358

Michael J. Minerva, Capital Collateral Counsel, Tallahassee, FL, Martin J. McClain, Capital Collateral Regional Counsel, Miami, FL, Gail E. Anderson, Capital Collateral Regional Counsel, Greensboro, FL, for Petitioner.

Margene A. Roper, Attorney General's Office, Dept. of Legal Affairs, Daytona Beach, FL, for Respondents.

## ORDER

G. KENDALL SHARP, District Judge.

This case is before the Court for review of a Petition for Writ of Habeas Corpus filed by a person in state custody, Thomas Harrison Provenzano, pursuant to 28 U.S.C. § 2254. Respondents filed a response to the petition, and Petitioner filed a reply to the response.

## I. STATEMENT OF THE FACTS

The Court adopts the facts as set out in the Supreme Court of Florida's opinion, in disposing of Petitioner's direct appeal, *Provenzano v. State*, 497 So.2d 1177 (Fla.1986), *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987). Petitioner had been arrested for disorderly conduct by two officers of the Orlando Police Department, and the charge became an obsession with Petitioner. Petitioner continually followed and threatened to kill the officers who arrested him. Petitioner purchased several weapons, including a .38 caliber revolver, 12 gauge shotgun, and .45 caliber semi-automatic weapon. Petitioner had pockets sewn into the inside lining of his jacket for the purpose of concealing the weapons. On the day of his disorderly conduct trial, Petitioner was wearing the jacket which had the inside pockets sewn, and he carried into the courtroom a knapsack, which contained a gun stock for his .45 caliber weapon and ammunition for the .38 caliber revolver. After a bailiff told him that he would be required to leave the knapsack outside or have it searched, Petitioner took his knapsack to his car. Petitioner returned to the courtroom without his knapsack, and the presiding judge subsequently instructed Bailiff Dalton to search him. As Bailiff Dalton approached, Petitioner reached in his pocket and shot Bailiff Dalton. Petitioner then chased and shot Corrections Officer Parker. Bailiff Wilkerson exited the courtroom into the hallway where the shooting was taking place. Dalton and Parker were both shot and injured by Petitioner. Wilkerson was shot and killed by Petitioner. Petitioner was later shot in the back by Corporal A.C. Jacobs of the Orange County Sheriff's Department.

## II. PROCEDURAL HISTORY

Petitioner was convicted of two counts of attempted first-degree murder and one count of first degree murder; the trial court followed the jury's recommendation and sentenced Petitioner to death for the murder conviction. The trial court also sentenced Petitioner to consecutive terms of imprisonment for thirty years as to each of the attempted first degree murder convictions.

Petitioner appealed the judgments and sentences to the Supreme Court of Florida, raising nine claims,[1] and that court affirmed the convictions and sentences. *See Provenzano v. State*, 497 So.2d 1177 (Fla.1986), *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987).

The Governor of Florida subsequently signed a death warrant. Petitioner then filed with the state trial court a motion for post-conviction relief and a request for stay of execution and with the Supreme Court of Florida a petition for writ of habeas corpus and request for stay of execution. Petitioner raised twenty-three claims in his motion for post-conviction relief, and the trial court found many of the claims to be procedurally barred,[2] while the remainder of the claims were found to be without merit. The state trial court denied the motion for post-conviction relief and the request for a stay. The trial court did not hold an evidentiary hearing on the motion.

Petitioner appealed the denial to the Supreme Court of Florida, which granted Petitioner's request for a stay of execution. Petitioner raised twelve claims in the petition for writ of habeas corpus,[3] ten arguments in his initial brief on appeal[4] and six other arguments in a supplemental brief filed in the same appeal.[5] The Supreme Court of Florida subsequently denied the petition for a writ of habeas corpus and affirmed the denial of the motion for post-conviction relief. *See Provenzano v. Dugger*, 561 So.2d 541 (Fla.1990). However, the Supreme Court of Florida did require the state attorney to disclose to Petitioner's attorney those portions of his file covered by Chapter 119, Florida Statutes as interpreted in *State v. Kokal*, 562 So.2d 324 (Fla.1990). Petitioner was allowed an extension of time of sixty days to file a new motion for post-conviction relief predicated on any

1. The nine claims included the following: 1) the trial court erred when it instructed the jury on transferred intent; 2) the trial court erred in denying Petitioner's request for a change of venue; 3) there was insufficient evidence to support the conviction for first degree murder; 4) the trial court erred in finding that the killing of the victim was cold, calculated, and premeditated; 5) the trial court erred in finding that the killing of the victim was for the purpose of disrupting or hindering the lawful exercise of a governmental function; 6) the trial court erred in failing to consider and find statutory and non-statutory mitigating circumstances; 7) there was improper prosecutorial questioning and argument; 8) there was an accumulation of errors; and 9) section 921 .141, Florida Statutes was unconstitutional.

2. Although Petitioner alleged twenty-three different claims in the motion, the state trial court characterized the motion as alleging seventeen claims. Specifically, as to the seventeen claims characterized by the state trial court, claims 2, 3(c), (d), (e), (n), (q), 4(e), 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, and 17 were found to be procedurally barred.

3. The claims raised in the petition for habeas corpus included the following: 1) the penalty phase jury instructions improperly shifted the burden to Petitioner to prove that death was inappropriate; 2) there were other improper jury instructions at the penalty phase; 3) the jury instruction at the guilt phase on insanity was improper; 4) certain portions of the trial were held in Petitioner's absence; 5) the trial court failed to properly admonish the jury; 6) aggravating factors were unconstitutionally applied against Petitioner; 7) during the penalty phase portion of the trial the trial court and the prosecution improperly asserted that sympathy was an inappropriate consideration; 8) there was improper prosecutorial argument during closing argument at the guilt and penalty phases; 9) there was improper consideration of the victims' character and victim impact information; 10) the trial court failed to find certain mitigating circumstances at sentencing; 11) an inflammatory crime scene photograph was improperly allowed at trial; and 12) there was improper argument and comment by the prosecution and the trial court.

4. Those claims included the following: 1) the summary denial of the Rule 3.850 motion was erroneous; 2) Petitioner was not competent to proceed at trial; 3) Petitioner was denied effective assistance of counsel at the guilt and sentencing phases; 4) there was improper consideration of the victim's character and victim impact information; 5) the opinions of the mental health experts were inadequate; 6) the trial court erred in denying Petitioner's request for a change of venue; 7) Petitioner was denied effective assistance of counsel with regard to certain jury instructions; 8) trial counsel allowed prejudicial testimony to be introduced at trial; 9) the State withheld certain evidence; and 10) Petitioner incorporated the other claims presented in his motion for post-conviction relief.

5. All of the claims in the supplemental brief dealt with Petitioner's argument that the State violated Chapter 119, Florida Statutes by failing to disclose certain documents.

claims under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), arising from the disclosure of such files.

Petitioner subsequently filed a supplemental motion for post-conviction relief with the state trial court,[6] which was denied. The Supreme Court of Florida affirmed the denial. *Provenzano v. State,* 616 So.2d 428 (Fla. 1993).

### III. *MERITS OF THE PETITION*

#### A. *Claims Pertaining to Guilt/Innocence*
##### *Claim I*

Petitioner states that the trial court's failure to grant him a change of venue deprived him of his right to a trial before a fair and impartial jury. According to Petitioner, there was extensive and prejudicial pre-trial publicity that "saturated the community in which [Petitioner] was tried...." Petitioner also alleged ineffective assistance of counsel based on counsel's failure to timely request a change of venue.

 This claim was raised on direct appeal, and the Supreme Court of Florida initially determined that the claim was procedurally barred because it had not been preserved for appellate review. *Provenzano,* 497 So.2d at 1181. The federal court must dismiss those claims or portions of claims that either (1) have been explicitly ruled procedurally barred by the highest state court considering the claims,[7] or (2) are not exhausted but would clearly be

barred if returned to state court.[8] Thus, "[f]ederal courts are precluded from addressing claims that have been held to be procedurally defaulted under state law. In addition, federal courts may not address claims that have not been presented in state court if the state court would have found the claims to be procedurally defaulted...." *Tower v. Phillips,* 7 F.3d 206, 210 (11th Cir.1993).[9] This claim is procedurally barred in this Court because the last state court rendering a judgment in Petitioner's case clearly and expressly stated that its judgment rested on the procedural bar. Although the Supreme Court of Florida did also address the merits of the claim, this claim still is procedurally barred. In *Alderman v. Zant,* 22 F.3d 1541, 1549 (11th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994), the Eleventh Circuit Court of Appeals stated as follows:

> [W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.

(Citations omitted).

 There are two exceptions to the procedural default bar: the first is the "cause and prejudice" exception;[10] the second, which is a narrow one, is the "actually innocent" exception, alternatively known as the "fundamental miscarriage of justice" excep-

6. Petitioner himself also filed several *pro se* motions with the state trial court during these proceedings, which were eventually stricken. In the supplemental motion for post-conviction relief, Petitioner argued that the State withheld certain material and exculpatory evidence.

7. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

8. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims); *Bassette v. Thompson,* 915 F.2d 932, 937 (4th Cir. 1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639,

113 L.Ed.2d 734 (1991) ("[w]hen a claim is never presented to the state court *Teague* does not require that the last state court rendering judgment 'clearly and expressly' state that its judgment rests on a procedural bar.").

9. Also, if the petitioner attempts to raise the claim in a manner not permitted by state procedural rules, he is barred from pursuing the same claim in federal court. *Alderman v. Zant,* 22 F.3d 1541, 1549 (11th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994).

10. *See Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) ("when a procedural default bars state litigation of a court claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice.").

tion, used in extraordinary circumstances. *See Johnson v. Singletary*, 938 F.2d 1166, 1174–75 (11th Cir.1991), *cert. denied*, 506 U.S. 930, 113 S.Ct. 361, 121 L.Ed.2d 274 (1992).

In the present case, Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The Court has reviewed the entire record and concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, this claim is procedurally barred.

Alternatively, the Court will address the merits of the claim. On the morning that the trial started, Petitioner stated for the first time that he had been laboring under the misconception that the venire would be selected from voters throughout the State of Florida and that he did not want to be tried by a jury selected from Orange County, Florida voters. (R. 3.) After some discussion, the trial court granted leave to file an oral motion for change of venue. (R. 18.) The motion was taken under advisement under the condition that a written motion would follow shortly thereafter. (R. 18.) The oral motion requested that a ruling be deferred until after *voir dire* in order to determine if the jurors would be able to render a fair and impartial verdict. (R. 19–20.) No written motion was ever filed. During the discussion of this matter, Petitioner's counsel informed the trial court that conducting the trial in Orange County was a tactic of the defense. (R. 9–10.) Counsel preferred selecting a jury from Orange County rather than from the St. Augustine area, the location where the trial would have been moved, because he believed that the insanity defense would be more effective in Orange County than in the more conservative community of St. Augustine. Although Petitioner insists that he did not want to be tried by Orange County jurors, Petitioner and his counsel discussed the jury selection,[11] and counsel informed the trial court after the jury had been selected

that "Let's have a run at it. The defendant accepts." (R. 369.) Additionally, the defense did not use all of its peremptory challenges during the jury selection.

 The standard governing change of venue issues is derived from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to be tried by a panel of jurors who are impartial and indifferent. *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). There are two standards that guide the analysis of change of venue issues: the actual prejudice standard and the presumed prejudice standard. *Id.* "Actual prejudice occurs when the prejudice actually enters the jury box and affects the jurors." *Heath v. Jones*, 941 F.2d 1126, 1134 (11th Cir.1991), *cert. denied*, 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992). A petitioner is unable to establish actual prejudice without proving that at least one juror should have been dismissed for cause. *Id.* "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." *Coleman*, 778 F.2d at 1490. The presumed prejudice standard is rarely applicable and is reserved for an extreme situation. *Id.*

 In the present case, Petitioner has not met the actual prejudice standard because he has not shown that prejudice actually entered the jury box or that at least one juror should have been dismissed for cause. All of the seated jurors denied having a fixed opinion as to Petitioner's guilt, and they all promised to follow the trial judge's instructions.

Likewise, Petitioner has not shown that the presumed prejudice standard is applicable because he has not met either the inflammatory or the saturation requirement of the presumed prejudice analysis. Petitioner

---

**11.** Petitioner's counsel informed the trial court: Your Honor, I've tried hundreds of criminal cases. And I've never ever allowed a client to consult with me on selection of a jury. But this is a totally different kind of fish And unless

I do, it will blow right back in our face. I need a recess to sit down and talk with this dude. You understand where I'm coming from? (R. 364.)

states that there was extensive and prejudicial media coverage of the case. However, although there was extensive publicity in Orange County with regard to the shooting and Petitioner's arrest, as the Supreme Court of Florida correctly noted, pretrial publicity in a case such as this one, standing alone, does not require a change of venue. The record does not support Petitioner's claim that the news coverage was inflammatory. None of the articles cited by Petitioner was inflammatory; rather, they were purely factual presentations of the news about the incident. In addition, Petitioner does not cite any articles in which the media discussed highly prejudicial evidence in a manner that raises concerns about potential jurors being influenced by information not properly subjected to the "crucible of the adversarial process." *Heath*, 941 F.2d at 1133 (quotation omitted) (citation omitted).

■ Moreover, Petitioner has not demonstrated that the media coverage saturated the market. Petitioner must prove 1) that a substantial number of the people in the relevant community could have been exposed to some of the prejudicial media coverage, and 2) that the effects of the media saturation continued until the trial. *Heath*, 941 F.2d at 1136. The case stayed in the news for several weeks after the incident (in January, 1983 and February, 1983) and then again for a period of a few weeks in March, 1984; however, for the periods between February, 1983 through March, 1984 and after March, 1984 until trial, the case received little or no attention in the news media. Thus, Petitioner has failed to meet the second portion of the saturation requirement. Petitioner is unable to show that the media coverage, which was not inflammatory, marred his trial sufficiently for the Court to determine that this is one of those extremely rare cases in which presumed prejudice should be found. A review of the pretrial publicity and void dire examination shows that a fair and impartial jury was ultimately impaneled.

The Court also rejects Petitioner's claim that he received ineffective assistance of counsel with regard to this matter. The Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. The first prong of the *Strickland* test requires that the defendant demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The second prong of the *Strickland* test requires the defendant to show that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. *Strickland,* 466 U.S. at 689–690, 104 S.Ct. 2052.[12]

■ It is readily apparent that counsel's decision not to renew the motion for change of venue was a tactical one. Strategic choices of trial counsel are granted a heavy measure of deference in a subsequent habeas corpus attack. *Id.* at 690–91, 104 S.Ct. 2052. The Court must strongly presume that trial counsel rendered adequate assistance and the challenged conduct was the product of reasoned trial strategy. *Id.* at 690, 104 S.Ct. 2052. Additionally, it is unlikely that a change of venue would have been granted since there was no undue difficulties in selecting an impartial jury. Petitioner consulted with counsel as to the jury panel selection, and the defense did not use all of its peremptory challenges. Thus, counsel's performance was in no manner deficient with regard to this matter, and Petitioner has not shown prejudice.

### Claim II

Petitioner contends that he received ineffective assistance of counsel during the guilt phase of his trial and identifies the following issues: 1) difficulty in securing counsel; 2)

12. In *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome deter- mination; rather, to establish prejudice a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

inadequacy at the competency hearing; 3) failure to change venue; 4) inadequate voir dire; 5) inadequate cross-examination; 6) waiver of attorney/client privileges; 7) failure to present a defense of "imperfect" self-defense; 8) failure to permit defendant to testify; 9) failure to object to testimony of court officials; 10) failure to object to Petitioner's absence from critical stages; and 11) failure to assure adequate mental health assistance.

Petitioner asserted all eleven grounds in his motion for post-conviction relief. The trial court found that issues 3 and 4 were litigated on direct appeal and, therefore, could not be attacked by a motion for post-conviction relief. The trial court further found that issues 2, 5, 7, 8, and 9 involved trial strategy and did not support a claim for ineffective assistance of counsel. Issues 6, 10, and 11 were found legally insufficient to support a claim. The trial court did not specifically address issue 1. The Florida Supreme Court affirmed the trial court's decision, denying all Petitioner's ineffective assistance of counsel claims on appeal.

### 1. Issue One

Petitioner contends that difficulty securing trial counsel supports a claim for ineffective assistance under the Sixth Amendment. Steven G. Horneffer was initially appointed to represent Petitioner on January 12, 1984. On February 14, 1984, Mr. Horneffer's appointment was continued as a special public defender. However, both Mr. Horneffer and the Public Defender's Office subsequently motioned to withdraw from the case. The motions were granted and, on March 23, 1984, Jack T. Edmund was appointed to represent Petitioner. Dan Brawley was later appointed co-counsel for Petitioner. Mr. Edmund and Mr. Brawley served as counsel for Petitioner through sentencing.

Petitioner claims that although Mr. Horneffer filed "numerous motions on Mr. Provenzano's behalf, it is still obvious that he never intended to take the case to trial." Petitioner further states that the inability to find local counsel, coupled with the removal of the local State Attorney's Office and the Ninth Judicial Circuit judges, "created an atmosphere of uncertainty that permeated the entire pretrial period and hindered counsel's representation."

These allegations are conclusory and facially insufficient to satisfy either prong of the *Strickland* standard. Petitioner fails to demonstrate any specific instance of counsel's performance which fell below an objective standard of reasonableness. Furthermore, absolutely no prejudice to Petitioner has been shown. This claim is wholly without merit and must be dismissed.

### 2. Issue Two

Petitioner argues that his trial counsel was ineffective during the competency proceedings because he failed to present witnesses to rebut the State's experts and because he failed to develop the appropriate statutory criteria with his own expert. Petitioner further asserts that trial counsel was ineffective for failing to seek a new competency determination "when Mr. Provenzano was no longer capable of rational collaboration with counsel." (Traverse at 17.)

Upon request by Petitioner's initial trial counsel, the trial court appointed Dr. Robert L. Pollack to conduct a psychiatric examination of Petitioner and submit a report to Petitioner's counsel. (R. 2756.) Petitioner subsequently filed a Motion for Competency Determination. (R. 2766–67.) The trial court then appointed three additional experts to examine Petitioner. All three submitted reports finding Petitioner to be competent to stand trial and testified to such during the competency hearing. (R. 2791–95, 2798; Transcript of Competency Hearing at 5–7, 14–15, 26–28.) However, based on Petitioner's allegations of conflict of interest, the trial court did not rely on the testimony of one of the three additional experts. (R. 2809–2810.)

Petitioner contends that trial counsel was ineffective for failing to present witnesses to rebut the State's experts. However, even defense counsel's own expert clearly found Mr. Provenzano competent to stand trial. Petitioner fails to demonstrate what evidence of incompetency was available for counsel's use in rebuttal or could have supported the need for a subsequent competency determi-

nation. Moreover, no evidence has been offered to support Petitioner's contention that Dr. Pollack did not properly adhere to the statutory criteria for competency.[13] Thus, this Court is unable to conclude that counsel's performance was deficient. Furthermore, in addition to Dr. Pollack, the two other experts considered by the trial court unequivocally found Petitioner competent to stand trial. Thus, Petitioner suffered no prejudice as result of his counsel's alleged failures. This claim must fail.

### 3. Issue Three

Petitioner argues that trial counsel was ineffective for not filing a written motion to change venue. For the reasons stated in Claim I, *supra*, this claim is rejected.

### 4. Issue Four

Petitioner next claims his trial counsel was ineffective for failing to inquire during *voir dire* to "find out *what* they [jurors] had heard, or how it would affect their partiality in judging an insanity defense" (emphasis in original). The record clearly does not support this contention. Although the trial court specifically avoided inquiring into the details of pre-trial publicity experienced by the potential jurors, both the trial court and defense counsel inquired extensively of the venire to determine whether the exposure would have any impact on an individual's ability to render a fair and impartial verdict. In fact, any potential juror expressing the slightest reservation about his or her ability to disregard any pretrial publicity was promptly excused for cause. Furthermore, the trial judge and defense counsel both conducted considerable inquiry concerning each juror's ability to consider an insanity defense. Having reviewed the complete transcript of the jury selection proceedings, this Court concludes that Petitioner's trial counsel performed reasonably. However, even if counsel could be said to have been ineffective, Petitioner has failed to demonstrate any prejudice. This Court agrees with the Florida Supreme Court's determination that "a

fair and impartial jury was ultimately impaneled." 497 So.2d at 1182.

### 5. Issue Five

Petitioner contends that trial counsel failed to adequately confront and cross-examine ten of the State's rebuttal witnesses: Jay Hostetter, Wayne Blecha, David Laufman, Elizabeth Jones, Sonny Barnett, Robert Thomas, Mark Beaulieu, Victor Uvalle, Vicki D'Auitevil, and Diane Flynn. The first five witnesses either sold weapons, ammunition, or both to Petitioner; the next three individuals were law enforcement officers; and the last two were Orange County courthouse employees at the time of the shooting. Petitioner argues that the first five witnesses were subject to possible impeachment since selling weapons and ammunition to someone believed to be mentally ill violates federal law. The law enforcement officers and courthouse employees were also subject to impeachment, according to Petitioner, based upon their possible association with the victims and pressure from their work communities. Finally, Petitioner alleges ineffectiveness of trial counsel in failing to conduct any cross-examination of Dr. Wilder.

Petitioner can demonstrate no prejudice because the lay witnesses testified Petitioner appeared to behave normally at various times prior to the incident and while taking steps to further his plan to kill the officers who had arrested him on the disorderly conduct charge. This testimony is entirely consistent with the defense's contention that Petitioner was entirely functional, except while in his delusional state. (R. 1559–60.) Defense counsel aptly covered this point during his cross-examination. (R. 1587–88, 1595–96, 1601–02.1607, 1608, 1614–15, 1619, 1628, 1633–34.)

Moreover, defense counsel's extensive cross-examination of the ten witnesses served to repeatedly remind the jury of a number of bizarre or odd incidents involving Petitioner. There is not a reasonable possibility that the result of the trial would have been different if the cross-examination set

---

**13.** It is also clear from the record that the three additional experts who found Petitioner competent to stand trial utilized the proper statutory criteria. (Transcript of Competency Hearing at 5–7, 14–15, 26–28.)

forth in the petition had been presented. In addition to these rebuttal witnesses, the State presented eight (8) other lay witnesses who testified to the apparent sanity of Petitioner. (R. 1576–78, 1647–49, 1651–54, 1656–57, 1661–63, 1665–67, 1670–73, 1675–77).

As to Dr. Wilder, defense counsel clearly made a tactical decision not to cross-examine this individual. During closing argument Mr. Edmund stated:

> You know, even one of their psychiatrists, the old lion who I did not cross-examine—and the reason I didn't cross-examine him is that the old lion simply said, "I think he would be found insane. I think he comes within the purview of the M'Naughten rule." That old lion, the State's witness, didn't give you the opinion as to the sanity or insanity of Tommy Provenzano. And he spent more time with him than any of the rest of them did. And he sat there and said, "I think he would be found ...", and I think he would this, and I think he would that. And that was his testimony.

(R.1936–37.) In fact, defense counsel utilized Dr. Wilder's testimony three times during closing argument to support Petitioner's insanity defense. (R. 1304–05, 1324, 1336–37). Strategic choices of trial counsel are granted a heavy measure of deference in a subsequent habeas corpus attack. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. The Court must strongly presume that trial counsel rendered adequate assistance and the challenged conduct was the product of reasoned trial strategy. *Id.* at 690, 104 S.Ct. 2052. Thus, the trial counsel's decision to forego cross-examination of Dr. Wilder cannot support a claim for ineffective assistance of counsel.

*6. Issue Six*

Petitioner contends trial counsel was ineffective for waiving attorney/client privilege regarding testimony by two of the State's witnesses: Josephine Stafford, a legal investigator with a law firm representing Petitioner in an automobile accident claim, and Kim-

berly Duff, a communications assistant at the Public Defender's Office.

Ms. Stafford testified as to Petitioner's clothing and appearance when she saw him, as well as comments Petitioner made concerning when he was stopped by Officers Shirley and Epperson in August of 1983. Ms. Stafford's testimony did not include any conversations or advice regarding the automobile accident claim for which her firm had been retained. (R. 911–17.)

Ms. Duff testified as to Petitioner's clothing and mood the day of and the day before the shooting incident. In addition, Ms. Duff recounted a comment Petitioner made approximately one hour before the shooting: "I can't wait. I have got it beat. I can't wait until those two policeman walk in. I'll show them." (R. 920–23.)

 Section 90.502 of the Florida Statutes defines the contours of the attorney client privilege. Essentially, a client has the privilege to prevent disclosure of confidential communications disclosed during the rendition of legal services. § 90.502(2), Fla. Stat. (1995).[14] The privilege is only available when all the elements are present, i.e. " '(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived.' 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev.1961)." *International Tel. & Tel. Corp. v. United Tel. Co. of Florida*, 60 F.R.D. 177, 184–85 (M.D.Fla.1973); *see also Modern Woodmen of America v. Watkins*, 132 F.2d 352, 354 (5th Cir.1942) ("The privilege, however, does not extend to every statement made to a lawyer. If the statement is about matters unconnected with the business at hand, or in a general conversation, or to the lawyer merely as a personal friend, the matter is not privileged.").

---

**14.** This particular statutory provision reads the same today as it did at the time of Petitioner's trial.

 Neither Ms. Stafford's nor Ms. Duffs testimony related "confidences" as contemplated by the statute. In fact, Ms. Duffs statement relating the comments of Petitioner the morning of the shooting is the only testimony which can even arguably be said to relate to the purpose of the attorney/client relationship. However, these comments of Petitioner were clearly not intended to be shielded from third parties. Petitioner made the similar remarks to various other persons not circumscribed by the statutory privilege. (R. 1402 "This is where bad guys get their butts kicked."; R. 865 "I'm going to do it. I'm going to do it. This is where guys get their ass kicked."; R. 878 Officer Shirley testified "And then as I was leaving he, he passed and he said, he said, 'I'll get you. You'll see.' Something to that effect. He said it twice."; R. 893, 900–01 Petitioner threatened to kill officers at time of original citation; R. 905 Petitioner later told Epperson he would kill him.) Moreover, the testimony as to Petitioner's appearance and state of mind was not shielded by the privilege. *Malinauskas v. U.S.*, 505 F.2d 649, 655 (5th Cir.1974) (counsel who consulted with petitioner prior to entry of guilty plea did not reveal privileged communication when he testified, based upon his observations and conversations, as to petitioner's competence at the time of the plea).

Since the challenged testimony was not privileged, defense counsel's performance was not unreasonable. In addition, Petitioner has failed to show any prejudice resulting from the testimony. The information duplicated other evidence presented during the trial. This ineffective assistance of counsel claim must fail.

### 7. Issue Seven

 Petitioner states that defense counsel was ineffective for failing to present a defense of "imperfect" self-defense. In sup-

port of this claim, Petitioner does not cite to any Florida case law recognizing the theory of an "imperfect" self-defense, and this Court is unable to locate any Florida support for this doctrine. Accordingly, defense counsel cannot be said to have performed unreasonably. On the contrary, the record reflects a thorough and vigorous presentation of an insanity defense. Counsel was not required to advocate a position with no legal support and which could have undermined the Petitioner's primary defense.[15] *People v. Criscione*, 125 Cal.App.3d 275, 177 Cal.Rptr. 899 (Cal.App. 1 Dist.1981) (defendant's counsel was not ineffective for failing to present imperfect self-defense theory because it would have been inconsistent with their defense on the grounds of diminished capacity).

### 8. Issue Eight

 Petitioner states that he wanted to testify at trial and defense counsel denied him his "absolute, fundamental right to testify in his own behalf."

During a bench conference held in the middle of the defense's opening statement, Petitioner's trial counsel indicated an intention to have Petitioner testify. (R. 493–94.) However, at a later bench conference during the defense's case, counsel represented that a decision had not been made as to whether Petitioner would testify. (R. 1411–12.) Despite Petitioner's apparent ability to interject his beliefs and contentions during the proceedings, at no point does the record reflect any assertion by him of his right to testify. Accordingly, the bare record does not support his contention that he was denied the right to testify.

Furthermore, Petitioner testified coherently and rationally during the penalty phase of the proceedings. Much of his testimony was inconsistent with his insanity defense. In

---

**15.** The "imperfect" self-defense, as recognized in other jurisdictions, essentially:

applies where the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victims' death are necessary to avert the threat, but these beliefs are objectively unreasonable. Imperfect self-defense is not a complete de-

fense to homicide. However, it negates malice forethought and thereby reduces a homicide which would otherwise be murder to voluntary manslaughter.

*People v. Curtis*, 30 Cal.App.4th 1337, 1354–55, 37 Cal.Rptr.2d 304, 314 (Cal.App. 4 Dist.1994), *cert. denied*, 516 U.S. 948, 116 S.Ct. 391, 133 L.Ed.2d 312 (1995).

fact, portions of his testimony contradicted testimony by defense witnesses concerning specific instances of alleged odd or bizarre behavior. Petitioner also testified unequivocally that on the day of the shooting he knew right from wrong (R. 2154, 2165) and that the shooting was accidental (R. 2113).

Although it appears that counsel's actions were reasonable, the Court does not need to address this element because Petitioner has clearly failed to show prejudice. Petitioner's testimony, under oath, during the penalty phase contradicts the basis for his defense and would definitely have undermined his claim of insanity. Having failed to satisfy the prejudice element of the *Strickland* test, Petitioner cannot prevail on this claim.

### 9. *Issue Nine*

 Petitioner asserts that trial counsel was ineffective for failing to object to the testimony of Judge Cosner, a court official. Petitioner finds error based on alleged public statements made by Judge Cosner "which tended to establish the guilt of Thomas Provenzano."

Judge Cosner was a material witness to the shooting incident, which took place in his courtroom. His only involvement in Petitioner's trial was a witness, not as a court official. Counsel's performance regarding this witness' testimony was not unreasonable and no prejudice has been or can be shown by Petitioner. This claim is meritless and must be denied.

### 10. *Issue Ten*

Petitioner ascribes error for counsel's alleged failure to object to his absence from three "critical stages" of the proceedings.

In assessing whether counsel's performance fell below an objective standard of reasonableness, *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052, the Court must review the merits of the action Petitioner contends counsel should have taken at trial. Petitioner's presence was not required at any of the "stages" set forth in his argument. *See infra* Claim X. Trial counsel's performance regarding this issue clearly satisfied an objective level of reasonableness. Accordingly, the first prong of the *Strickland* analysis has not been met and this claim must fail.

### 11. *Issue Eleven*

Petitioner argues that counsel was ineffective for failing to assure adequate mental health assistance. These allegations are essentially identical to the issues raised in Claim VII. For the reasons stated in Claim VII, *infra*, this claim is without merit.

### Claim III

Petitioner argues that because of his counsel's unreasonable performance he was denied his fundamental right to confront a witness through cross-examination. Petitioner refers to cross-examination of ten of the State's rebuttal witnesses: five individuals who sold Petitioner weapons or ammunition, three law enforcement officers, and two courthouse employees. Petitioner contends the first five should have been cross-examined concerning their obligations and responsibilities under federal law regarding sales to unstable persons. The final five should have been questioned regarding bias arising from their occupations and possible repercussions from colleagues.

 The confrontation clause of the Sixth Amendment guarantees that every criminal defendant has the right to confront witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Because the Confrontation Clause of the Sixth Amendment has been incorporated in the Fourteenth Amendment, courts must apply its dictates equally to state criminal proceedings. *Pointer v. State of Tex.*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The opportunity to conduct reasonable cross-examination is of primary interest in this Sixth Amendment right. *See U.S. v. Calle*, 822 F.2d 1016, 1020 (11th Cir.1987); *Haber v. Wainwright*, 756 F.2d 1520, 1522 (11th Cir.1985).

 The United States Supreme Court has observed "the Confrontation Clause guarantees an *opportunity* · for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106

S.Ct. 292, 88 L.Ed.2d 15 (1985) (*per curiam*) (emphasis in original). Provided that the opportunity for cross-examination as required by the Sixth Amendment has been satisfied, the trial judge's discretionary authority comes into play. *Haber,* 756 F.2d at 1523 (quoting *U.S. v. Kopituk,* 690 F.2d 1289, 1337 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983)). In particular, the Eleventh Circuit Court of Appeals has stated that cross-examination may be limited, without violating the defendant's Sixth Amendment rights, under the following circumstances:

> (1) the jury, through the cross-examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and,
>
> (2) the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased.

*Calle,* 822 F.2d at 1020 (quotation omitted). · In this case, the trial record reveals that the trial court in no way impeded or limited defense counsel's opportunities to show possible bias and demonstrate various reasons for the jury to question the credibility of the witnesses. Counsel took advantage of these opportunities. Petitioner's counsel elicited from the witnesses not only possible weaknesses in their assessment of Petitioner's sanity, but also utilized the testimony of several of the witnesses to further the defense's theory.

In sum, the jury was made aware of potential flaws in the witnesses' testimony. Therefore, the cross-examination was sufficient to expose the relevant facts from which the jury could draw inferences and evaluate the credibility of the witnesses. Defense counsel was able to make a record from which to argue that the testimony was unreliable. *See U.S. v. Brown,* 634 F.2d 819, 825 (5th Cir.1981) ("[w]hether the defendant's Sixth Amendment rights have been violated depends ... not only on the use to which the excluded testimony could have been put, but also on the alternative means open to the defendant to impeach the credibility of the witness.").

The Court finds that there was no Sixth Amendment violation. *See U.S. v. Williams,* 837 F.2d 1009, 1015 (11th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988) ("trial judges retain wide latitude to impose reasonable restrictions on cross-examination to prevent interrogation that is confusing, repetitive, or marginally relevant."). Counsel was allowed extensive cross-examination of the witnesses, and the State's objections and the trial court's rulings with regard to the objections were proper. Moreover, there has been no proffer of what additional impeachment value there would have been in further cross-examination. Petitioner's counsel was, in any event, free to seek other avenues of cross-examination.[16]

### *Claim IV*

 Petitioner states that trial counsel ineffectively and prejudicially allowed patently irrelevant and inadmissible testimony to be introduced at Mr. Provenzano's trial in violation of his constitutional rights. Specifically, Petitioner argues that it was error for his trial counsel to elicit the testimony from two defense experts regarding Petitioner's prognosis and future potential for dangerousness. The defense called Dr. Lyons to testify as to Petitioner's sanity at the time of the offense. Dr. Lyons testified, in pertinent part, as to Petitioner's prognosis:

> *Q.* Do you have an opinion to a reasonable medical certainty as to whether or not up to and including the episode, and for now, of January the 10th, of 1984, Thomas Provenzano was suffering from the mental disease of paranoia?
>
> *A.* I think he was at that time. I think he probably has been suffering from it off and on.
>
> *Q.* As part of your mental—
>
> *A.* (Interposing) For several years, at least the last two, it has become more noticeable.

---

16. The merits of Petitioner's ineffective assistance of counsel claim regarding this issue have been addressed in Claim II, Section 5, *supra.*

Q. Did your mental processes include a prognosis as to his future and the possibility or probability of effective treatment?

A. I think effective treatment would be almost impossible to come by considering the system to which he would probably be put in.

(R. 1471–72.)

Defense counsel next called Dr. Pollack to testify as to Petitioner's sanity. During his testimony Dr. Pollack also expressed his opinion regarding whether Petitioner was dangerous:

Q. Is Mr. Provenzano a dangerous person?

A. I believe you have to look at, number one, the illness, and whether or not it's reversible and controllable, and number two, look at the pattern of behavior it generates. The nature of this illness is one that has led him to a point of, taking another individual's life. This was done with a rather violent tone to it. He does not perceive this as being wrong. He does not perceive this as necessitating any specific consequence. He was adhering to a belief system which he probably still adheres to. This is not an illness which is amenable to easy treatment. It's not, not an illness to psycho-pharmacological treatment. Current modalities of rotare is unsuccessful. If you look at it from the criteria of dangerousness, several studies on that, an individual who has done these types of offenses, who continues to believe in them, who has no remorse about them, will most probably do it again. This then makes him, I believe, an extremely dangerous individual who most probably would perform a similar act given other circumstances that he would perceive similarly.

Q. Because of his illness?

A. Yes, sir.

Q. His illness is so severe that that's the way you can predict or you would at least prognose that he may be?

A. Yes, sir.

(R. 1542–43.)

Petitioner contends that this testimony was irrelevant, inadmissible, and diverted the jury's attention from the issue of Petitioner's sanity at the time of the offense. Having elicited the testimony, Petitioner argues that his trial counsel rendered ineffective assistance which was so prejudicial that he was denied a fair trial.

Petitioner relies upon two cases from Alabama and Tennessee to support his contention. In the Alabama death penalty case, *Ex parte State*, 486 So.2d 476 (Ala.1985), the defendant also relied on an insanity defense. During the guilt portion of the trial, the prosecutor elicited testimony from the defendant's expert on cross-examination to the effect that the defendant experienced psychotic episodes during which he was capable of shooting someone again. *Id.* at 477–78. The Alabama court determined that permitting the prosecutor to elicit this type of testimony was unfairly prejudicial to the defendant. Thus, the case was remanded for a new trial. *Id.* at 479.

In reaching its conclusion, the Alabama court relied upon the Tennessee case argued by Petitioner. *State v. Barksdale*, 590 S.W.2d 931 (Tenn.1979). The Tennessee prosecutor, during cross-examination, specifically asked the defense's expert on mental disease, whether he could "assure us that he won't go out this afternoon and do it again?" The expert stated that without treatment the odds were that the defendant would repeat the behavior. The prosecutor then inquired if the treatment was on an outpatient basis allowing the defendant to "walk the streets." The expert answered affirmatively. *Id.* at 932. The Tennessee court found the admission of such testimony to be reversible error and remanded the case for a new trial. *Id.*

The final case cited by the Petitioner is inapposite. In *Teffeteller v. State*, 439 So.2d 840 (Fla.1983), *cert. denied*, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984), the prosecutor argued forcefully and at length during the penalty phase closing argument that unless subjected to the death penalty the defendant would kill again. The Florida Supreme Court found the trial court committed reversible error when it denied defendant's motion for mistrial after the prosecutor's argument. *Id.* at 844–45.

Petitioner now claims that his trial counsel's performance was not objectively reasonable because he elicited testimony regarding his prognosis and future potential for dangerousness. However, in order to understand the value of the challenged testimony, the Court cannot consider the testimony in a vacuum; rather, the Court must evaluate the entire context of the experts' testimony.

Petitioner's trial counsel vigorously asserted an insanity defense. To that end, his experts testified that he suffered from the mental disease of paranoia that rendered him insane under the Florida standard (R. 1445–59, 1471–72, 1532–34, 1536–37.) On the other hand, the State's experts contended that Petitioner merely suffered from paranoid personality traits which did not affect his ability to distinguish right from wrong. (R. 1687–90, 1752–54, 1773, 1813–17.) Defense counsel elicited testimony from his experts regarding the difference between paranoia and a paranoid personality (R. 1465–68, 1521–22.) One of the distinctions centered on the progressive nature of the ailment—paranoia escalates, but paranoid personalities remain static (R. 1467–68).

In addition, the defense experts testified concerning Petitioner's homosexual concerns and sense of fear arising from a perceived threat of being touched by another man. This manifestation of paranoia was offered as a triggering factor for the shooting incident. Essentially, the expert explained that the threat of being physically searched triggered an uncontrollable reaction that resulted in Petitioner shooting the uniformed individuals, based on a perceived need to defend himself. (R. 1461–62, 1537–38, 1540–42.)

Dr. Lyons' testimony concerning Petitioner's prognosis merely explained the diagnosis of paranoia versus paranoid traits or personality. In assessing effectiveness of treatment, Dr. Lyons referred to "the system to which he would probably be put in." This merely emphasized the defense's theme of paranoia centered around law enforcement. Taken in context, the testimony offered by defense counsel was not objectively unreasonable. Similarly, Dr. Pollack's testimony regarding the "dangerousness" of Petitioner was not objectively unreasonable. Again, defense counsel merely emphasized the role of Petitioner's paranoia in setting off the chain reaction. The testimony was qualified as an assessment of whether Petitioner would commit a "similar act given other circumstances that he would perceive similarly."

These statements, taken in context, do not compare to the circumstances set forth in the Alabama and Tennessee cases relied upon by Petitioner. This Court cannot conclude that trial counsel performed unreasonably in eliciting the challenged testimony. Moreover, there is no indication that any alleged error prejudiced Petitioner. The testimony only served to underscore the severity of the alleged mental condition and the defense's theory that Petitioner was insane at the time of the incident. Upon the facts before this Court, it cannot be said that the jury's focus was impermissibly shifted or that the trial was rendered fundamentally unfair.

### Claim V

■ Petitioner next contends that trial counsel was ineffective for failing to object to improper jury instructions regarding his insanity defense and for failing to propose correct instructions. The instructions given by the trial court were the standard jury instructions at the time:

An issue in this case is whether the defendant was legally insane when the crime allegedly was committed. You must assume he was sane unless the evidence causes you to have a reasonable doubt about his sanity.

If the defendant was legally insane, he is not guilty. To find him legally insane, these three elements must be shown to the point you have reasonable doubt about his sanity:

1. The defendant had a mental infirmity, defect, or disease.

2. This condition caused the defendant to lose his ability to understand or reason accurately, and

3. Because of the loss of these abilities, the defendant:

a. Did not know what he was doing, or

b. Did not know what would result from his actions, or

c. Did not know it was wrong, although he knew what he was doing and its consequences.

In determining the issue of insanity, you may consider the testimony of expert and non-expert witnesses. The question you must answer is not whether the defendant is legally insane today, or has always been legally insane, but simply if the defendant was legally insane at the time the crime allegedly was committed.

(R. 3298.)

While Petitioner's appeal was pending, the Florida Supreme Court found this instruction to be erroneous. *Yohn v. State,* 476 So.2d 123 (Fla.1985). The *Yohn* court found that, because the standard instruction did not address the burden of proof regarding an insanity defense, the jury was not charged completely and accurately. *Id.* at 127–28. Thus, Petitioner argues that his trial counsel was ineffective for not objecting to the instruction or proposing an accurate instruction.

Any ineffective of assistance of counsel inquiry begins with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Review of counsel's performance must be gauged from his perspective at trial, without the distorting effects of hindsight. *Id.; Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.), *cert. denied,* 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995). At the time of Petitioner's trial, the standard jury instruction was widely used and the *Yohn* case had not yet been decided. Counsel is not required to anticipate successful challenges to the law. As the Eleventh Circuit Court of Appeals has stated, "the test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Waters,* 46 F.3d at 1518. Counsel's performance adhered to the constitutional level of objective reasonableness.

Furthermore, Petitioner has not and cannot demonstrate prejudice on this issue. This Court agrees with the Florida Supreme Court's determination that, although erroneous, the instruction "was not so flawed as to deprive a defendant claiming insanity of a fair trial." *Provenzano,* 561 So.2d at 545. This conclusion is bolstered by a review of the record. Through voir dire, opening arguments, and closing arguments, the jury was repeatedly made aware of the fact that the State had to prove that Petitioner was sane. (R. 230–31, 278, 353, 477–78, 1907, 1923, 1963–64.) The result of the trial was not rendered unfair or unreliable; thus, Petitioner has failed to satisfy the prejudice prong of the *Strickland* test.

### Claim VI

Petitioner avers that the State withheld material and exculpatory evidence in violation of his constitutional rights and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). According to Petitioner, the State failed to disclose a psychiatric report prepared by Dr. Joy Abraham; Petitioner's "jail records" during the time of Petitioner's "pretrial incarceration"; and the notes of Dr. J. Lloyd Wilder, who testified at trial on behalf of the State.

On the appeal of the denial of Petitioner's first motion for post-conviction relief, the Supreme Court of Florida affirmed the denial, but required the state attorney to disclose to Petitioner's counsel "those portions of his file covered by chapter 119 . . . ." *Provenzano,* 561 So.2d at 549. Petitioner was then allowed sixty days from the disclosure to file a new motion for post-conviction relief predicated on any claims under *Brady* arising from the disclosure of such files. Petitioner then filed a new motion for post-conviction relief with the state trial court raising the instant claim. The trial court determined as follows: 1) the defense was well aware of Dr. Joy Abraham's report as well as all of Petitioner's medical records concerning his stay at the Orlando Regional Medical Center following the shootings, and these records were given to the mental health experts; 2) Petitioner's jail records were equally accessible to the defense; and 3) Dr. Wilder testified at trial that he took notes while interviewing Petitioner and used those notes while testifying; thus, even if counsel did not have those notes, counsel could have objected to or asked to see the notes. The Supreme Court of Florida affirmed the denial. *See Provenzano v. State,* 616 So.2d 428 (Fla.1993).

▉▉▉▉ The Eleventh Circuit has determined that in order to establish a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the petitioner must demonstrate the following:

> (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*U.S. v. Meros*, 866 F.2d 1304, 1308 (11th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). For purposes under *Brady*, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Stewart*, 820 F.2d 370, 374 (11th Cir.1987) (quotation omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *U.S. v. Agurs*, 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Further, "*Brady* does not require the government to turn over information which, with any reasonable diligence, the defendant can obtain himself." *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir.1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985) (quotation omitted).

▉▉▉ The Court finds that this claim is without merit. The information allegedly suppressed by the State either was in possession of the defense or could have been obtained from sources other than the State. Petitioner has completely failed to demonstrate that the State suppressed this evidence. *See U.S. v. Crawford*, 906 F.2d 1531, 1537 (11th Cir.1990) (the petitioner and "[d]efense counsel were in as good a position as the prosecutor to learn more about the [evidence].").

Petitioner's first attorney, Steven G. Horneffer, was obviously aware of Dr. Abraham's psychiatric report because, two days after the shooting, he filed a Motion for Controlled Access to Defendant's Medical Reports, which was granted. (R. 2704, 2724.) The motion requested that the court seal the records of Dr. Abraham's interview to everyone except Petitioner, his attorneys, and any medical experts appointed by the court. Although Mr. Horneffer was replaced by another attorney, the subsequent attorney either had or could have obtained Dr. Abraham's report. Further, Dr. Robert Pollack testified in his deposition that he had reviewed medical records from the Orlando Regional Medical Center, which included a consultation report by Dr. Abraham. (R. 2619.) Therefore, Petitioner either had the report or could have obtained the report, and there was no *Brady* violation.

Petitioner's jail records could have been obtained from jail officials if his counsel had desired to do so. In fact, Petitioner's counsel moved for the production of jail records concerning visitor attendance, which was granted.[17] (R. 2963–64, 2971.) Thus, Petitioner had access to the jail records, and there was no *Brady* violation.

Likewise, there was no *Brady* violation with regard to Dr. Wilder's notes. Dr. Wilder testified at trial that he took notes while interviewing Petitioner, and Dr. Wilder used those notes while testifying. (R. 1809–10.) If Petitioner's counsel sought to review the notes, he merely needed to ask to see them at that time.

The Court also concludes that, even if the evidence discussed above was wrongfully withheld and had been revealed, Petitioner has not demonstrated that the outcome of the proceedings would have been different.

▉▉▉ Additionally, the Court rejects Petitioner's argument that counsel was ineffective for failing to discover the above information or to present it to the jury. As to Dr.

---

**17.** In particular, counsel sought records showing the date, time, and length of interview that the following individuals had with Petitioner: Dr. Abraham, Dr. Robert Kirkland, Dr. Michael Gutman, and Dr. Wilder.

Abraham's report, Petitioner is unable to show prejudice. Dr. Abraham interviewed Petitioner immediately following the shootings—when he was brought to the hospital to be treated for gunshot wounds. Dr. Abraham concluded that Petitioner suffered from chronic paranoid psychosis.[18] Nevertheless, since the jury found Petitioner to be sane and recommended a death sentence despite the testimony of two defense experts and one State expert that Petitioner had severe paranoid delusions, the introduction of another report discussing Petitioner's paranoia would not have made a difference in this case.

As to the jail records, these records provided a daily log of Petitioner's behavior in jail while awaiting trial and indicated that Petitioner was calm and cooperative. The Court agrees with the Supreme Court of Florida: "This evidence contradicts the defense's theory that Provenzano suffered from paranoid delusions about persecution from uniformed law enforcement officers, since obviously Provenzano was constantly confronted by uniformed officers in jail, yet he adjusted well." *Provenzano*, 616 So.2d at 432. Thus, counsel's performance was not deficient, and Petitioner has not shown prejudice with regard to this matter.

Finally, Petitioner refers to Dr. Wilder's notes and to his statement that "officers had afforded him the privacy that security would permit." At trial, Dr. Wilder stated that Petitioner told him that he was "very angry" at a correctional officer who had looked at him in an improper manner while he was showering. (R. 1807–08.) The "other corrections officers ... had attended to the necessities of security, but they hadn't stayed and stared at him naked." (R. 1808.) The Court determines that Dr. Wilder's notes would not have influenced the jury's decision at either the guilt phase or the penalty phase. Thus, counsel's performance was not deficient, and Petitioner has not shown prejudice with regard to this matter.

### Claim VII

■ Petitioner avers that failures on the part of defense counsel and the mental health experts rendered the opinions of the experts professionally and constitutionally inadequate. Specifically, he alleges that defense counsel failed to investigate, develop and present the necessary collateral information and evidence to the court-appointed mental health experts. In fact, Petitioner contends that "significant and crucial background facts regarding mental, emotional, and psychological background were never sought out, reviewed, or considered." Instead, Petitioner argues that "self-report from a deranged defendant formed the primary basis for diagnosis." The claim is largely premised on a 1989 evaluation by Dr. Fleming, who diagnosed Petitioner as suffering from paranoid psychosis both during the shooting and at the time of the trial.

Both the state trial court and the Florida Supreme Court rejected Petitioner's claim. *Provenzano v. Dugger*, 561 So.2d 541, 546 (Fla.1990). The state supreme court found the diagnosis duplicated that of the defense's trial experts and that "[t]he mere fact that Provenzano has now secured an expert who might have offered more favorable testimony is an insufficient basis for relief." *Id.*

Petitioner's arguments concerning investigation, development, and presentation of collateral and background information simply are not supported by the record. Counsel garnered a plethora of information and provided it to the mental health experts:

Dr. Pollack testified to the following:

a. He examined Petitioner twice. Before the first interview he intentionally avoided reviewing any information. (R. 2615–17.)

b. After his initial interview he requested as much information as he could from defense counsel. He received quite a bit of information, including police offense reports and investigative reports. (R. 1530–31.) In fact, he continued to receive information for quite some time. (R. 1531–32.)

c. He reviewed newspaper articles, investigative report (including fifty to sixty pages of witness interviews), and medi-

---

**18.** Dr. Abraham prepared the consultation report on January 10, 1984. (Supplemental Transcript of Record As To Second Motion For Post-conviction Relief at 382.)

cal records (including Dr. Abraham's report which was rendered shortly after the shooting). (R. 2617–19.)

d. After writing his report, he received twenty-three more witness statements which reinforced his conclusions. (R. 2619–20.)

e. He talked to jail officials about Petitioner's behavior. (R. 1555.)

Dr. Lyons testified to the following:

a. Before examining Petitioner he was given various court documents; police reports; investigative reports; the statement of Kimberly Duff; the Internal Affairs report regarding Petitioner's complaint of excessive force during arrest; Petitioner's employment history; statements of Janice Limpkey and Mary T. O'Brian; a summary of Petitioner's military record; reports of Drs. Pollack, Kirkland, Gutman (two reports), Callahan, and Wilder; Orlando Regional Medical Center progressive reports following the shooting; and a summary of Dr. Marra's reports. (R. 1440–42, 1671–72.)

b. Prior to the examination, he was provided with information concerning the time Petitioner signed an application "Jesus Christ." (R. 2683–84.)

c. He was aware of Petitioner's interest in both Theresa Chambers and Susan Assad. (R. 1462–63.)

d. Petitioner informed him of childhood problems, particularly relating to his relationship with his father. (R. 1464.)

e. He was aware of Petitioner's two marriages, the results of each, and the background concerning the loss of his two children. (R. 1465.)

f. At the time he interviewed Petitioner, he had copies of the typed interviews done by the investigators, psychiatric reports, and past medical histories. (R. 1505–06.)

In addition to the expert testimony, the defense presented a variety of lay witnesses who testified to numerous incidents and be-

haviors reflecting on Petitioner's mental health.

This Court has reviewed the cases relied upon by Petitioner and concludes that they are factually distinguishable. In the instant case, defense counsel promptly obtained a court order to retain investigators. (R. 2705–06.) Myriad witnesses were interviewed, background information was assembled, family members were contacted, and medical records were reviewed. The scope and extent of the investigation conducted by trial counsel were reasonable. *Thompson v. Wainwright*, 787 F.2d 1447, 1450 (11th Cir. 1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987)("A criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation.").

Furthermore, the record reflects that counsel forwarded this information to the defense experts who utilized the materials in forming their opinions. Neither the presentation of the information nor the experts' reliance on the materials was unreasonable. Both the attorneys and the experts conducted their duties in a professional, competent, and reasonable manner. The fact that additional facts subsequently surfaced and were utilized by Dr. Fleming to reach the same diagnosis does not render the earlier doctors' opinions inadequate. *Waters*, 46 F.3d at 1513–14.

Finally, trial counsel's decision not to duplicate evidence of Petitioner's alleged mental incapacity during the penalty phase was not unreasonable. *Id.* at 1512–13. During the penalty phase closing arguments, defense counsel clearly argued facts brought out during the guilt phase, and the judge correctly instructed the jury that they could consider guilt phase evidence during the penalty deliberations. (R. 2226.) Neither the trial attorneys nor the experts rendered ineffective assistance to Petitioner.[19] Moreover, Petitioner has failed to demonstrate prejudice. The conclusion offered by Dr. Fleming merely duplicates the opinions of the trial experts. This claim must fail.

---

**19.** As set forth below, *see Claim IX, Section 2*, counsel's performance regarding the presenta-

tion of mental illness as a mitigating factor was not unreasonable.

### Claim VIII

Petitioner contends that his constitutional rights were violated because "he was forced to undergo criminal judicial proceedings although he was not legally competent." According to Petitioner, "[h]is lack of competency should have been obvious to the court, defense counsel, and the defense psychiatrists, as well as to the State's psychiatrists." Petitioner relies primarily on an examination performed by Dr. Pat Fleming in 1989.

In this case, Petitioner's counsel filed a Motion for Competency Determination prior to trial.[20] (R. 2766–67.) The trial court then entered an order appointing Dr. Robert Kirkland, Dr. J. Lloyd Wilder, and Dr. Michael Gutman as experts to examine Petitioner and to determine if Petitioner was competent to stand trial. (R. 2784–85.) Dr. Gutman submitted a report dated February 20, 1984, determining that Petitioner was competent to stand trial; Dr. Kirkland submitted a report dated February 22, 1984, determining that Petitioner was competent to stand trial; and Dr. Wilder submitted a report dated February 23, 1984, determining that Petitioner was competent to stand trial. (R. 2791–95, 2798.) The trial court held a competency hearing on March 1, 1984, during which Dr. Gutman, Dr. Kirkland, and Dr. Wilder testified. These experts testified that Petitioner was competent to stand trial, and it is apparent that these experts did consider the proper statutory criteria. (Transcript of Competency Hearing at 5–7, 14–15, 26–28.) On March 6, 1984, the trial court entered an order finding as a matter of fact and law that Petitioner was competent to stand trial. (R. 2809–10.) In making its determination, the trial court relied on the testimony of Dr. Kirkland· and Dr. Wilder, but did not rely on Dr. Gutman's testimony.[21]

■ In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held that the test for determining competence to stand trial was "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 402, 80 S.Ct. 788. A defendant must present "clear and convincing evidence to create a 'real, substantial and legitimate doubt as to [his] mental capacity ... to meaningfully participate and cooperate with counsel ....' " *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986) (quoting *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir.1973)). As noted by the Eleventh Circuit, "[t]he standard of proof is high. The facts must 'positively, unequivocally and clearly generate' the legitimate doubt." *Id.* (quoting *Bruce*, 483 F.2d at 1043). The Court must determine whether the petitioner has met "his burden of positively, unequivocally and clearly raising a legitimate doubt as to his competency to stand trial." *Card v. Singletary*, 981 F.2d 481, 483 (11th Cir.1992), *cert. denied*, 510 U.S. 839, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993).

■ The Court determines that Petitioner has failed to generate a real, substantial and legitimate doubt as to his competence. The competency of Petitioner was thoroughly explored by the trial court prior to trial. Petitioner was examined by several psychiatrists, and each of them concluded that Petitioner was competent to stand trial. At the competency hearing, Dr. Wilder, Dr. Kirkland, and Dr. Gutman testified that Petitioner was competent to stand trial. Petitioner has presented no evidence to show that any of the psychiatric examinations was professionally inadequate. The trial court conducted a proper competency hearing and found Petitioner to be competent. "The trial court's finding that [the petitioner] was competent to stand trial is presumed to be correct and may not overturned if it is fairly supported by the record." *See Medina v. Singletary*, 59 F.3d 1095, 1111 (11th Cir.

---

**20.** The trial court had previously entered an Order for Psychiatric Evaluation on February 3, 1984, and Dr. Robert W. Pollack was appointed to examine Petitioner and to submit a report to Petitioner's counsel. (R. 2756.)

**21.** Petitioner had alleged that Dr. Gutman labored under a conflict of interest.

1995), *cert. denied*, 517 U.S. 1247, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996). The trial court's finding of competence is fairly supported by the record before the trial court at the time of the decision. The allegations now asserted by Petitioner, including the report of Dr. Fleming, simply do not demonstrate a real, substantial, and legitimate doubt as to his competence. Moreover, since Petitioner has not presented evidence that "positively, unequivocally, and clearly generates doubt as to his competence at the time of his trial," he is not entitled to an evidentiary hearing on this claim. *Id.* at 1111 (quotation omitted) (citation omitted). Therefore, this claim must fail.[22]

### Claim X

 Petitioner alleges that his constitutional rights were violated because he was not present at the following matters: 1) a hearing held on May 1, 1984, with regard to his motions to dismiss the indictment and to suppress the unlawful search and the Orlando Sentinel's motion to open depositions to the public; 2) the jury instruction conference held in the trial judge's chambers; and 3) a motion for mistrial made after the State's closing argument in the guilt phase.

The Supreme Court of Florida concluded that "[n]one of these occurrences can be viewed as critical stages of the trial" and that Petitioner "could not have made a meaningful contribution to counsel's legal arguments on these occasions." *Provenzano,* 561 So.2d at 548. Upon independent review, the Court determines that this claim is without merit.

In *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), the Supreme Court held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."

Petitioner's presence at any of the proceedings identified above would not have been useful in ensuring a more reliable determination of any of the matters at issue.[23] *See id.* at 747, 107 S.Ct. 2658 (the respondent gave no indication that his presence at the hearing would have been useful in ensuring a more reliable determination). These proceedings involved essentially legal argument, and there was no constitutional right to be present at such proceedings. *Cf. In re Shriner,* 735 F.2d 1236, 1241 (11th Cir.1984) (the petitioner had no constitutional right to be present at the bench during conferences that involved purely legal matters). Petitioner has not demonstrated that he was in any manner prejudiced by his absence from these proceedings, and it is apparent that he "would have added nothing nor gained anything by attending" these proceedings. *See United States v. Brown,* 923 F.2d 109, 112 (8th Cir.), *cert. denied,* 502 U.S. 833, 112 S.Ct. 110, 116 L.Ed.2d 80 (1991) (the *in camera* proceedings focused on events about which the defendants had no knowledge, and the defendants would have added nothing nor gained anything by attending); *see also United States v. Gagnon,* 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (the respondents "could have done nothing had they been at the conference, nor would they have gained anything by attending."). There was no constitutional infirmity with regard to this matter.[24]

### Claim XI

 According to Petitioner, after the jury recessed following the guilt phase of the trial, the trial court did not provide the jury with a proper admonishment concerning the necessity of avoiding media coverage during the recess. Petitioner also contends that his counsel was ineffective for failing to request that the jury be instructed to avoid media

---

**22.** Petitioner also argues that Dr. Pollack indicated in his report that Petitioner "could become quite violent" and "lose control" and that counsel failed to develop this information and was thereby ineffective. However, Dr. Pollack also concluded that Petitioner was *competent* and simply cautioned that Petitioner could become disruptive in court. Consequently, the Court determines that this ineffective assistance of counsel claim is without merit.

**23.** The Court notes that Petitioner apparently was present at the motions hearing on May 1, 1984, because the trial court's minutes from that hearing so indicate. (R. 2931–32.)

**24.** The Court also finds that counsel was not ineffective with regard to this matter, which is more fully discussed previously under Claim II, Section 10.

coverage and for failing to request an inquiry regarding the jury's exposure to improper influences during the recess.

After the guilt phase of the trial was completed, the trial court instructed the jury as follows:

Ladies and gentlemen, as I informed you before the trial started, by your verdict it is now necessary that I have a second hearing before this same jury for the purpose of the jury determining and recommending to the Court a sentence. Because I'm unable to have that immediately I'm going to release you at this time and allow you to return to your home. You'll be notified by the Court when the second hearing is set here in Orlando.

I'll ask you and instruct you, please, in the interim don't discuss this case or how you arrived at your verdict or anything about the case, or let anyone discuss it with you. You're still, in effect, sitting on a jury. I can't keep you sequestered for it will be a couple of weeks before I can set the thing, before the Court's prepared to hear the second phase of it. You don't have to talk to anybody about this case, the press, or anybody else. You never will have to talk to them. But particularly while the case is still pending, and one phase of the case is pending, a very important phase, please don't discuss this verdict. If anybody approaches you about it tell them that you can't discuss it with them. If they persist please report that fact to me when I reconvene you in the immediate future.

I want to thank you for your patience here, and the attentiveness you've shown to the lawyers and the presentation of evidence.

I at this time, without further a due, I'll excuse you and ask the bailiff to take charge of you, and see that you're transported back to the hotel you have been sequestered in. The sequestering is lifted. But that still doesn't mean that you cannot, you can talk about the case.

(R.1992–93.)

In the present case, the trial court did advise the jurors, upon completion of the guilt phase and prior to sentencing, that they should not discuss the case with anyone and that they should not allow anyone to discuss the case with them. The Court must determine "whether the procedures adopted by the trial court were sufficient to determine whether (further) jury inquiry was necessary to resolve questions of bias." *Palmariello v. Superintendent of M.C.I. Norfolk,* 873 F.2d 491, 495 (1st Cir.), *cert. denied,* 493 U.S. 865, 110 S.Ct. 185, 107 L.Ed.2d 140 (1989) (quotation omitted) (citation omitted). The approach adopted by the trial court was adequate. "Whether or not, in an ideal world, more could have been accomplished is not the question." *Id.* It is apparent that the procedure used in this case was not constitutionally infirm.

Moreover, Petitioner has not shown that the jury was actually prejudiced by the media coverage. *See Frank v. Brookhart,* 877 F.2d 671, 675 (8th Cir.1989), *cert. denied,* 493 U.S. 1027, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990) (the petitioner failed to demonstrate that the jury was actually prejudiced by the news accounts). "Mere exposure to publicity about a trial or information about a defendant is not grounds for a new trial." *Id.* Therefore, this claim must fail.

Additionally, the Court finds that counsel was not ineffective with regard to this a matter. Petitioner has not shown that counsel's conduct was in any manner unreasonable or that he has sustained prejudice.

### Claim XIV

Petitioner argues that the comments made by the prosecutor and the judge violated *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by diminishing the jury's sense of responsibility in determining whether death was an appropriate sentence. Petitioner claims he is entitled to relief both on the merits of this claim, as well as based upon ineffective assistance of counsel since his trial counsel failed to object to the allegedly improper comments.

Petitioner did not raise the merits of this *Caldwell* claim on direct appeal. The merits of the claim were raised in Petitioner's Rule 3.850 motion. (Emergency Motion to Vacate Judgment and Sentence, and Consolidated Emergency Application for Stay of Execu-

tion, with Special Request for Leave to Amend and Supplement at 196–209.) The trial court concluded that the issue had been litigated on direct appeal and, thus, denied the relief.[25] (Order Denying Defendant's Emergency Motion to Vacate Judgment and Sentence and Consolidated Emergency Application for Stay of Execution, with Special Request for Leave to Amend and Supplement at 13, 14.) Petitioner appealed, claiming that trial counsel was ineffective for failing to object to the improper comments and instructions. (Summary Initial Brief of Appellant on Appeal of Denial of Motion for Fla.R.Crim.P. 3.850 Relief at 78–79.) The State's response alleged a procedural default. Because the comments were "consistent with Florida law on capital sentencing," the Florida Supreme Court concluded that counsel had not been ineffective. *Provenzano*, 561 So.2d at 545. Finally, Petitioner filed a state habeas corpus petition raising an ineffective assistance of appellate counsel claim regarding this issue. (Petition for Extraordinary Relief, for a Writ of Habeas Corpus, Request for Stay of Execution, and, if Necessary, Application for Stay of Execution Pending the Filing and Disposition of Petition for Writ of Certiorari at 82–95.) Since no objection was made at trial, the Florida Supreme Court also denied this claim. *Provenzano*, 561 So.2d at 549. The highest state court addressed the instant claim and did not apply a procedural bar. Thus, it appears that the claim is ripe for determination by this Court.

In *Caldwell*, the Supreme Court vacated the imposition of the death penalty because "the jury's sense of responsibility for determining the appropriateness of death" was minimized. 472 U.S. at 341, 105 S.Ct. 2633. The Supreme Court concluded "that it is unconstitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appro-

priateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633.

In *Caldwell*, the prosecutor told the jury that their decision was automatically reviewable by the state supreme court. *Id.* at 325–26, 105 S.Ct. 2633. In Mississippi, the jury is the final sentencer, but if a sentence of death is given, it is automatically reviewable by the state supreme court. The prosecutor's statement was misleading because it implied that review of the death sentence was *de novo*. In contrast, under Mississippi law, review of the jury's death sentence is presumed correct, and the state supreme court may only reverse it under limited circumstances. *Id.* at 331, 105 S.Ct. 2633.

In Florida sentencing proceedings, where the trial court is the sentencer, *Caldwell* has been applied because of the very strong role the jury has been given by the Supreme Court of Florida in determining the appropriate sentence in a capital case. *Mann v. Dugger*, 844 F.2d 1446, 1450–54 (11th Cir. 1988). Two opinions of the Eleventh Circuit have applied *Caldwell* with varying results. *Mann v. Dugger*, 844 F.2d 1446, 1448 (11th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989); *Harich v. Dugger*, 844 F.2d 1464 (11th Cir. 1988) (en banc), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989).

In *Mann* the majority applied the following analysis:

In reviewing *Caldwell* claims, our task is twofold. First, we must determine whether the prosecutor's comments to the jury were such that they would "minimize the jury's sense of responsibility for determining the appropriateness of death . . . ." Second, if the comments would have such effect, we must determine "whether the trial judge in this case sufficiently corrected the impression left by the prosecutor."

*Mann*, 844 F.2d at 1456 (citations omitted).[26] Applying this test, the Court concluded that

---

25. This Court has thoroughly reviewed the record, including the appellate briefs, and it appears the trial court erroneously concluded that the *Caldwell* issue was addressed on direct appeal.

26. The dissenters in *Mann* applied a different, more subjective analysis:

"The relevant question under *Caldwell* is whether remarks made at trial lessened the jury's sense of responsibility toward its role of determining whether the death penalty is appropriate." From our perspective as members of the Court of Appeals, this necessarily involves a case by case approach with detailed review of the entire record of any given case.

the prosecutor's statements were improper and that the judge's comments failed to correct the misimpression left by the prosecutor. *Id.* at 1457–58.

In *Harich*, the Court held that no *Caldwell* violation had occurred.[27] The *Harich* prosecutor made one misleading statement to the effect that the jury's decision was only a recommendation and that the court could pronounce whatever sentence it saw fit. *Id.* at 1476.[28] The court informed the jury that the court was to make the final decision and that the jury's role was only advisory. *Id.* at 1474, 1476–77.[29]

The plurality stated "that comments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* 'as long as the significance of the [jury's] recommendation is adequately stressed.'" *Id.* at 1475 (quoting *Pope v. Wainwright*, 496 So.2d 798, 806 (Fla.1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987)). Thus, the plurality found nothing improper about the prosecutor's comments in *Harich*.

The five who formed part of the majority in *Mann* stated that while the prosecutor's comment that "[t]he Court pronounces whatever sentence it sees fit" mischaracterized the role of the jury, it was not error when read in context with the prosecutor's whole statement, which emphasized that the jury's decision was a factor to be considered by the judge.[30] *Id.* at 1477.

Under either of the two analyses from *Mann* and *Harich*, the statements by the prosecutor and trial judge in the instant case do not rise to a *Caldwell* violation. The prosecutor's comments to the jury did not "minimize the jury's sense of responsibility for determining the appropriateness of death." *Mann*, 844 F.2d at 1456; *see also Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) ("To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.").

Petitioner objects to various comments made by the prosecutor. On voir dire, Mr. Kunz stated:

As Judge Shepard told you, this particular case involves a crime of first degree murder. Under the law of the State of Florida, as Judge Shepard has indicated, this crime of first degree murder carries a maximum penalty of death. In this regard

---

The bottom line, however, is the subjective reaction of each individual judge to the language and text of the record.
*Mann*, 844 F.2d at 1461.

**27.** In *Harich*, the four dissenters from *Mann* formed a plurality; five judges from the majority in *Mann* agreed with the plurality that there was no *Caldwell* violation but disagreed with the plurality's analysis, and two judges from the majority in *Mann* dissented, disagreeing with the plurality's conclusion and analysis.

**28.** At voir dire, the prosecutor stated: "Let me add that yours is a recommendation to the Court. The Court pronounces whatever sentence it sees fit. But yours is a recommendation, giving some direction to the Court as to what the circumstances show." *Harich*, 844 F.2d at 1476.

**29.** At voir dire, the trial judge stated: "[I]t is the judge's job to determine what a proper sentence would be if the defendant is guilty." *Harich*, 844 F.2d at 1474.

At the conclusion of the guilt/innocence phase, the trial judge stated: "The penalty is for the court to decide. You are not responsible for the penalty in any way because of your verdict...." *Id.*

At the beginning of sentencing, the trial court stated: "The final decision as to what punishment shall be imposed rests solely upon the judge of this court. However, the law requires that you, the jury, render to the court an advisory sentence as to what punishment should be imposed upon the defendant." *Id.*

In the sentencing instructions, the trial court stated: "Ladies and gentlemen of the jury, it is now your duty to advise the Court as to what punishment should be imposed upon the Defendant for his crime of first-degree murder. As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge; however, it is your duty to follow the law which will now be given to you by the Court and render to the Court an advisory sentence...." *Id.* at 1477.

**30.** These five judges stated that the conclusion that the prosecutor's comments were not misleading does not end the analysis: The "ultimate focus is on the trial court's actions. We must examine the court's actions and determine whether reasonable jurors, in light of the entire trial, would have been mislead as to the importance of their decision." *Harich*, 844 F.2d at 1478 (*citing Mann*, 844 F.2d at 1457).

it's important that you understand how this trial will proceed. In Florida in cases which have the death penalty, we have what's called a bifurcated trial. That means the trial is divided in two parts. The very first part, the jury decides whether or not the defendant is guilty. And the second part, which only occurs if the defendant renders a guilty verdict of first degree murder, then the same jury is asked to review certain evidence and make recommendation to the Court as to the sentence of death or life imprisonment.

Now, only Judge Shepard can then impose a life sentence with a minimum of twenty-five years in prison or the death penalty. Judge Shepard will make the final decision if the defendant's convicted of first degree murder. Do you all understand that?

. . . .

Some people have an honest and strong conviction against the death penalty, and is certainly entitled to their opinions. And they don't have to apologize for those con-

victions that they have. But the question I'm going to ask you goes only to the first phase of this particular trial. We talked about the guilt phase, the determination of guilt or innocence. I'm not talking about the recommendation now as to what the sentence should be. But if you return a verdict of guilty as charged, the defendant would be subject under the law in Florida to the death penalty, regardless of what you would do later on. Do you all understand that?

(R. 162–63, 164.) In addition, Petitioner cites twelve instances during voir dire when the prosecutor used either "advisory" or "recommendation" in reference to a jury's role in sentencing. (R. 178, 179, 180, 181, 271, 272, 273, 274, 329, 408–09, 410, and 411.) Petitioner also points out seven similar instances during the prosecutor's closing argument at sentencing. (R. 2171, 2172, 2173–74, 2189, 2193, 2196, and 2200.) These comments do not approach the improper statements of the prosecutor in *Mann*.[31] Taken in context, the comments accurately set forth the jury's role in Florida's bifurcated capital proceedings.[32]

31. In *Mann* on voir dire, the prosecutor stated: The recommendation that you make to Judge Federico in [the sentencing] portion of the trial is simply a recommendation, and he is not bound by it. He may impose whatever sentence the law permits. He will have been here and will have listened to all the testimony himself.
. . .
You understand you do not impose the death penalty; that is not on your shoulders.... Again, that decision rests up here with the law, with Judge Federico. You will have the opportunity after you have heard everything there is to hear to make a recommendation to him. But it is not legally on your shoulders, though. It is not your ultimate decision. You act in that regard in an advisory capacity only.
. . .
You ... understand that the ultimate responsibility rests with the Court; that it's not the jury's responsibility?
At the closing of the guilt/innocence phase, the prosecutor stated: "The matter of sentencing ultimately rests with [the] Court."
At the closing of the sentencing phase, the prosecutor stated: ,
What I'm suggesting to you is that the ultimate responsibility for the imposition of the sentence rests with Judge Philip Federico. That is his sworn position in the system. He's heard everything you have heard. He may have the opportunity to learn more before he imposes a sentence. I think this community, as repre-

sented by this jury, should give to him the prerogative of imposing the death penalty, if that's what he ultimately feels is required in this case.
*Mann v. Dugger*, 844 F.2d 1446, 1455–56 (11th Cir.1988) (en banc).

32. During the penalty phase closing arguments both the prosecutor and defense counsel emphasized the importance of the jury's role in the sentencing proceedings. The prosecutor stated:

Now, I want to emphasize one more thing before we proceed in discussing aggravating circumstances. The law is not going to come in here and ask you to do something that doesn't mean anything, doesn't make any difference. The judge is no doubt going to impose a sentence in this case. I mean, he's the one who has the burden on his shoulders, and he's going to impose it. An he'll impose it properly. But you will make a recommendation, and it's an important recommendation.
The judge doesn't have to agree with that recommendation. It doesn't mean it's not important, what you're doing, because you would not be a party to this particular procedure or this system if what you are doing is not important. It is important, and your recommendation this afternoon is going to be very important with respect to the sentence of the defendant.
And because it's not a unanimous verdict, even though it's what is known as a majority

In fact, the comments are more like the comments of the prosecutor in *Harich*, which nine members of the Court concluded were proper. Thus, the prosecutor's comments in this case did not minimize the jury's sense of responsibility for determining the appropriateness of death.

As the prosecutor's comments were not improper under the analysis in *Mann*, there is no need for the Court to determine "whether the trial judge in this case sufficiently corrected the impression left by the prosecutor." *Mann*, 844 F.2d at 1456.

■■■ In *Harich*, however, even after finding that the prosecutor's comments were not error, the five judges who formed part of the majority in *Mann* still asked whether the trial court's actions, in light of the entire trial, would have misled reasonable jurors as to the importance of their decision. *Harich*, 844 F.2d at 1478 (*citing Mann*, 844 F.2d at 1457). A review of the judge's comments in this case reflects that the jury was not misled. At voir dire, the trial judge instructed the prospective jurors on the bifurcated process:

> The penalty for murder in the first degree, the maximum sentence, is death or life imprisonment. If a verdict of guilty of murder in the first degree is rendered by the jury in this case then as soon as practical thereafter evidence will be presented to the same jury as to any matters relating to the sentence, including aggravating and mitigating circumstances.

> The State and the Defense will present arguments for or against the sentence of death. Then the jury will render an advisory sentence to the Court as to whether the defendant should be sentenced to life imprisonment or death.

> This advisory sentence, unlike the verdict on the guilt phase of the trial, may be by a majority vote of the jury instead of a unanimous vote of the jury. And the jury then sentences the defendant to life imprisonment or death.

> The Judge is not required to follow the advice of the jury. Thus, the jury does not impose punishment. If such a verdict, that is, a guilty verdict is rendered, the imposition of punishment is the function of the Judge of this court, and that's me.

> However, because such a verdict could lead to a sentence of death, your qualification to serve as jurors in this case depends upon your attitude toward rendering a verdict that could result in a death sentence.

(R. 85–86.) Petitioner further cites to seven passages in which the trial court refers to the jury making a "recommendation" one way or the other at sentencing. (R. 90, 93.)

Next Petitioner alleges error in the trial court's instructions to the jury during both the guilt and penalty phases. The allegedly

verdict that will support a recommendation by y'all, still doesn't mean it's not an important decision.

The state would ask that each of you make up your own mind. Deliberate. Think about it yourself and make a recommendation. And collectively as a group make that recommendation, because it's important, that particular recommendation.
. . .

You are literally, ladies and gentlemen, the sword and the shield. It is up to you to make a neutral examination of a murder case; to weigh aggravating circumstances and mitigating circumstances; to evaluate whether, in fact, this is a crime in which the ultimate penalty, namely death, should be imposed; to make sure a defendant gets a fair trial and is given the protection of the laws under the system, under our great system.

(R. 2173–74.) And the defense attorney reiterated the importance of the jury's role in his closing:

There was a time in Florida when the jury in a first degree murder case could, in effect, set the penalty for the accused. That is no longer the law in Florida. It is now exclusively the province of the judge who presides over the case to determine the appropriate penalty. And that is, of course, as it should be.

That does not in any way lessen the importance of what you are here to do. You are the citizens before whom this citizen, Thomas Provenzano, has been tried. Your feelings and your evaluation of the facts against the law that the judge will give you are extremely important to the man who sits at that bench and who will have to make the final decision. I know that he will weigh your recommendation very carefully before he makes a final decision in this matter.

(R. 2201–02.)

flawed guilt instructions concerned possible penalties:

> I'll now inform you of the maximum and minimal, minimum possible penalties in this case. The penalty is for the Court to decide. You are not responsible for the penalty in any way because of your verdict. The possible results of this case are to be disregarded as you discuss your verdict. Your duty is to discuss only the question of whether the State has provided the guilt of the Defendant in accordance with these instructions.
>
> . . .
>
> The maximum penalty for the crime of murder in the first degree is death. The minimum penalty for the crime of murder in the first degree is life imprisonment with no parole for 25 years. You have previously been instructed on the manner in which the penalty for a conviction of first degree murder is determined.

(R.1981, 1982.) The penalty phase instructions began with a brief preliminary statement by the trial judge:

> Ladies and gentlemen of the jury, it is now your duty to advise the court as to what punishment should be imposed upon the defendant for his crime of murder in the first degree. As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the judge; however, it is your duty to follow the law that will now be given you by the court and render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of death, of the death penalty, and whether sufficient mitigating circumstances exist to

outweigh any aggravating circumstances found to exist.

> . . .
>
> The fact that a determination of whether a majority of you recommend a sentence of death or a sentence of life imprisonment in this case can be reached by a single ballot should not influence you to act hastily or without due regard to the gravity of these proceedings. Before you ballot, you should carefully weigh, sift and consider the evidence and all of it, realizing that human life is at stake, and bring to bear your best judgment in reaching your advisory sentence.

(R. 2226, 2230.)

The substance of the court's voir dire comments are very similar to the *Harich* court's. In addition, the guilt and penalty instructions are almost identical to the statements of the trial judge in *Harich*, which nine judges concluded were not improper.[33] Therefore this claim is found to be without merit. Furthermore, since counsel's performance was not unreasonable and no prejudice has been demonstrated, the ineffective assistance of counsel claim also fails.

### Claim XVIII

Petitioner asserts that he received ineffective assistance of counsel during the direct appeal of his conviction. Specifically, he claims counsel failed to raise the following issues on direct appeal: 1) the State's presentation of inflammatory, improper evidence and argument designed to elicit an emotional response denied Mr. Provenzano a fundamentally fair and reliable trial and sentencing; and 2) the issues raised in Claims V, X, XI, XIV, and XV of the instant petition.[34]

---

**33.** *See supra* note 28 for judge's comments in *Harich*.

**34.** The claims are summarized as follows: Claim V—trial counsel was ineffective for failing to object to improper jury instructions regarding an insanity defense and for failing to propose correct instructions. Claim X—Petitioner's constitutional rights were violated because he was not present at the following matters: 1) a hearing held on May 1, 1984; 2) the jury instruction conference held in the trial judge's chambers; and 3) a motion for mistrial made after the State's closing argument in the guilt phase. Claim XI—the trial court did not provide the jury

with a proper admonishment concerning the necessity of avoiding media coverage between the guilt and penalty phases. Petitioner also contends that his trial counsel was ineffective regarding this issue. Claim XIV—comments made by the prosecutor and the judge violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and trial counsel failed to object; thus, rendering ineffective assistance. Claim XV—penalty phase jury instructions "employed a presumption of death which shifted to Mr. Provenzano the burden of proving that life was the appropriate sentence."

Petitioner raised these six issues in a petition for habeas relief to the Florida Supreme Court. All six issues were addressed and rejected by the Florida Supreme Court. *Provenzano*, 561 So.2d at 547–49.

■■■ It is well established that a defendant has the right to effective counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984). The Eleventh Circuit has applied the Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir.1991), *cert. denied*, 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to prevail on these claims, Petitioner must satisfy both elements of the *Strickland* analysis: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense. 466 U.S. at 687–88, 104 S.Ct. 2052.

### 1. Issue One

The first issue addresses three pieces of evidence which were admitted during the State's case and which Petitioner contends were inflammatory, improper and deprived him of a fair and reliable trial and sentencing. All three pieces of evidence were admitted over objection by defense counsel.

First, Petitioner argues that a photograph of the victim, Mr. Wilkerson, taken at the scene after unsuccessful attempts at resuscitation should not have been admitted. Defense counsel stipulated to the identity of Mr. Wilkerson as the deceased and other, less gruesome, photographs of the scene were also admitted. Petitioner argues that the photograph did not accurately reflect the scene or Mr. Wilkerson's injuries and that appellate counsel should have raised this issue.

Next, Petitioner takes issue with an audio recording of the actual shooting. According to Petitioner, the tape prompted an emotional reaction from the audience which was ob-

served by the jurors. In denying defense counsel's motion for mistrial, the trial judge noted that he had not observed any audience members crying. Again, Petitioner finds appellate counsel ineffective for failing to raise this issue.

Finally, Petitioner contends that the testimony of Bailiff Dalton's wife during the sentencing phase, after the jury was excused, constituted improper information for the court to consider. Essentially, Mrs. Dalton testified as to the effect the attempted murder of her husband had on their family and her belief that the defendant should receive the maximum penalty for the attempted first degree murder charge. Petitioner asserts the failure to raise this issue on appeal also amounts to ineffective assistance of counsel.

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689–90, 104 S.Ct. 2052. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir.), *cert. denied*, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989).

Furthermore, "[c]ounsel need not pursue every path until it bears fruit or until all available hope withers." *Foster v. Dugger*, 823 F.2d 402 (11th Cir.1987), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988) (quoting *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)). "The appropriate legal standard is not error-free representation, but reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Additionally, tactical decisions by counsel seldom form the basis for federal habeas corpus relief. *See Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir.1988), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990); *Sanchez v. United States*, 782 F.2d 928, 935 (11th Cir.1986).

■■■ Appellate counsel did not render ineffective assistance. Although trial counsel did object to the admission of the photo-

graph, no motion for mistrial was made. Accordingly, appellate counsel was not able to argue error by the trial court regarding this issue. Appellate counsel did raise the propriety of the tape recording in the direct appeal (Initial Brief of Appellant at 58.) Finally, Mrs. Dalton's testimony of the impact of the crime on her family was permissible. *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Her statement that Petitioner's sentence "should be the maximum," (R. 2301), was hardly inflammatory and did not provide the basis for a meritorious appeal. Appellate counsel did not perform unreasonably in winnowing the appropriate issues for appeal.

Petitioner has also failed to demonstrate that prejudice resulted from any of the alleged deficiencies. None of the alleged deficiencies rendered the appeal process fundamentally unfair or unreliable. Accordingly, this ineffective assistance of appellate counsel claim must fail.

### 2. Issue Two

Petitioner next states that appellate counsel was also ineffective for failing to raise the issues set forth in Claims V, X, XI, XIV, and XV on direct appeal. Petitioner relies on the arguments set forth in each of the claims to support this contention. In assessing whether appellate counsel's performance fell below the objective standard of reasonableness, *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052, the Court must first review the merits of the underlying argument Petitioner contends appellate counsel should have advanced. This Court has determined that Claims V, X, XI, XIV, and XV are without merit. Accordingly, appellate counsel cannot be said to have performed unreasonably in not raising these issues on appeal. Furthermore, since the claims are without merit, Petitioner cannot demonstrate prejudice. This alleged ineffective assistance of appellate counsel claim must also fail.

### Claim XIX

Petitioner alleges that "[t]he evidence in this case is insufficient to prove beyond a reasonable doubt that Thomas Provenzano, from a premeditated design, took the life of Arnold Wilkerson." According to Petitioner,

"[t]he uncontroverted evidence shows that Mr. Provenzano was at most simply firing at any uniformed bailiff that approached him."

The standard of review in a federal habeas corpus proceeding when the claim is that the petitioner has been convicted on insufficient evidence was articulated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Supreme Court in *Jackson* described the inquiry as follows:

[W]hether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Id.* at 319, 99 S.Ct. 2781. Although the facts as they exist in the record may support opposing inferences, a federal habeas court must presume that the jury resolved such conflicts in favor of the prosecution and against the defendant. *See Heath v. Jones*, 863 F.2d 815, 820 (11th Cir.1989).

James Dunham testified at trial that he was at the courthouse on the day of the shootings visiting his wife, who worked as a secretary at the courthouse. (R. 663–64.) Mr. Dunham heard gunshots and then heard someone yell "I'm going to kill you, mother fuckers. I'm going to kill all of you." (R. 665.) Immediately, Petitioner came around the corner, and a few shots were fired. (R. 665.) Petitioner took a "military stance" and pointed a shotgun at Mr. Dunham and a bailiff, who "was taking cover in the back." (R. 666.) Petitioner thenfired more shots. (R. 666.)

The Court concludes that the evidence, when viewed in a light most favorable to the State and after resolving all conflicts in favor of the prosecution, mandates the denial of Petitioner's claims. *See Machin v. Wainwright*, 758 F.2d 1431, 1435 (11th Cir.1985) (the federal habeas court must presume that conflicting inferences to be drawn from the evidence were resolved by the trier of fact in favor of the prosecution). The jury obviously

found the evidence presented by the State more credible with regard to the issue of whether Petitioner committed first degree murder. The Court determines that a rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt. Merely because the evidence provides some support to Petitioner's theory, this does not warrant the granting of habeas corpus relief. *See Wilcox v. Ford,* 813 F.2d 1140, 1143–44 (11th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987); *Martin v. State of Ala.,* 730 F.2d 721, 724 (11th Cir.1984) ("[t]he simple fact that the evidence gives some support to the defendant does not demand acquittal.").

Accordingly, this Court concludes that the evidence, when viewed in a light most favorable to the state, and resolving all conflicts in favor of the prosecution, mandates the denial of this claim. *See Shaw v. Boney,* 695 F.2d 528, 531 n. 6 (11th Cir.1983). Under the *Jackson* standard, there was sufficient evidence to support the jury's verdict.

### Claim XX

Petitioner states that his trial was "fraught with procedural and substantive errors, which cannot be harmless when viewed as a whole since the combination of errors deprived him of the fundamentally fair trial guaranteed under the Sixth, Eighth, and Fourteenth Amendments." Petitioner claims that "the flaws in the system which sentenced Mr. Johnston [sic] to death are many." He includes not only the issues raised in the instant proceeding, but also those raised in the direct appeal, the state habeas petition, the Rule 3.850 motion, and the Rule 3.850 appeal.

This Court has reviewed the entire record of Petitioner's trial, appeal, and post-conviction proceedings. The record does not support this claim. As set forth in this Order, the alleged errors did not prejudice Petitioner in any phase of the proceedings. Petitioner was entitled to a fundamentally fair trial, not necessarily "flawless" proceedings. The determinations of Petitioner's guilt and sentence were made after proceedings conducted in accord with constitutionally mandated standards of due process.

### Claim XXI

Petitioner asserts that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated in various ways, thus denying him a fundamentally fair trial. Counsel states these points "are those which Mr. Provenzano wrote and specifically requested be presented to this Court." The State responded by moving to have the claim stricken because Petitioner is represented by competent counsel and the claims have not been timely presented to the state courts.

The fourteen points addressed in the claims are summarized as follows: 1) the trial judge should have asked the jurors, before deliberations, whether they could decide the guilt or innocence of the defendant without bias or prejudice; 2) court appointed trial counsel was ineffective for failing to develop and have the jury instructed on defendant's theory of defense; 3) defense counsel overrode defendant on his desire and request to testify at trial; 4) shifting the burden of proof to defendant during jury instructions at the trial phase was unconstitutional and trial counsel was ineffective for failing to object; 5) before the trial began and also at the sentencing or penalty phase the jury was incorrectly instructed and trial counsel was ineffective for failing to object; 6) failure of defense counsel to develop and inform jury of defendant's drug related flashbacks; 7) ineffective assistance of counsel based on (a) failure to file written motion to change venue, (b) failure to question three jurors if nationality, religion, or occupation would prevent them from giving defendant a fair trial, and (c) failure to ask jurors whether they "would give more credence to prosecution witnesses comprised of a reliance heavily on testimony of 'police officers'"; 8) defense counsel should have challenged or suppressed eight of the State's witnesses; 9) trial counsel was ineffective for not seeking a continuance to permit Petitioner to first go to trial on the disorderly conduct charges; 10) three witnesses testified that the bullet that shot Corrections Officer Parker was from Petitioner's gun, but the ballistics report states otherwise; thus, the ballistics reports and testimony were unreliable; 11) ineffective assistance of counsel for failure to

pursue defendant's right to release from determination and bail bond; 12) violation of Florida rules on pretrial release and pretrial detention and ineffective assistance of counsel regarding the same; 13) Sixth and Fourteenth Amendment violation on the basis that witnesses did not each hear and observe the same things, including statements made by defendant at the scene and the number of gunshots; and 14) ineffective assistance of counsel for failure to impeach witness James Dunham with a prior inconsistent statement.

Although counsel indicates that these issues are written by Petitioner, they are included in the petition, which is signed by counsel. Counsel specifically requests that the Court consider the issues. Petitioner has not acted as co-counsel, but has merely participated in the litigation process. Counsel has adopted and presented the issues to the Court.[35]

### 1. Procedural Default—Issues

The Eleventh Circuit Court of Appeals has held that the procedural bar applies to ineffective assistance of counsel claims brought in habeas cases: "a habeas petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously." *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir.1992) (footnote omitted).

 In response to the State's procedural bar argument, Petitioner states:

Mr. Provenzano filed *pro se* pleadings with his Supplemental Motion to Vacate Conviction and Sentence, and the Florida Supreme Court addressed these claims in its opinion. *Provenzano v. State*, 616 So.2d 428 (Fla.1993). The circuit court struck Mr. Provenzano's *pro se* pleadings, and the Florida Supreme Court found that counsel's motion to adopt Mr. Provenzano's pleadings, but not the pleadings themselves, was not timely. Mr. Provenzano

has presented the issue to the highest court that has the power to hear it, so habeas review is proper. *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

(Traverse at 56.) However, Petitioner misconstrues the state court proceedings. The Florida Supreme Court only addressed Petitioner's appeal of the order denying his counsel's motion to adopt the pro se pleadings. Since the pleadings were stricken, neither the trial court nor the high court considered the *merits* of the pro se pleadings. Accordingly, the issues in the stricken pleadings were not presented "to the highest court that has the power to hear" them.

 Issues 1, 2, 4, 6, 7(b), 7(c), and 8 through 14 raised in this were not presented to the state court. Thus, these issues appear' to be procedurally barred because they were not raised, and are clearly barred from being raised, in the state courts.[36]

In the present case, Petitioner has neither alleged nor shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actual innocence exception. The Court has reviewed the entire record and concludes that the Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, issues 1, 2, 4, 6, 7(b), 7(c), and 8 through 14 are procedurally barred.

Moreover, these claims are without merit. Issues 2, 4, 6, 7(b), 7(c), 8, 9, 11, 12, and 14 allege ineffective assistance of counsel. This Court has reviewed all the allegations and concludes that counsel did not perform unreasonably and Petitioner has failed to demonstrate prejudice. Claims 1, 10, and 13, which involve issues other than ineffective assistance of counsel, simply do not have any merit. The allegations are woefully inadequate to support a claim for federal habeas corpus relief.

---

**35.** Court notes that counsel, having signed the petition, did so under the requirements and dictates of Federal Rule of Civil Procedure 11. The mere fact that Petitioner may have formulated, or even written, portions of the petition does not in any manner relieve counsel of his ethical and legal obligations.

**36.** Ineffective assistance of appellate counsel claims not raised in first habeas petition were procedurally barred from being raised in a subsequent habeas petition. *Doyle v. Singletary*, 655 So.2d 1120, 1121 (Fla.1995).

### 2. Issues Three, Five, and Seven, subsection (a)

Issues 3, 5, and 7(a) repeat arguments made in other sections of the instant habeas petition. Issue 3 duplicates Claim II, Section 9; issue 5 duplicates Claim XIV; and issue 7(a) duplicates Claim II, Section 4. For the reasons stated in the respective sections of this Order, all three of these issues are also denied.

## B. Claims Pertaining to Sentencing Claim Claim IX

Petitioner asserts that he received ineffective assistance of counsel at sentencing because of the following: 1) counsel failed to request an instruction admonishing the jury not to view media coverage of the case following the guilt phase of the trial; 2) after the jury returned for the penalty phase of the trial, counsel failed to inquire about possible contamination of the jury by media coverage of the case; 3) counsel failed to provide the jurors with "any of the specifics they needed to understand the mental illness as it related to mitigation"; and 4) counsel failed to present evidence of Petitioner's difficult upbringing. Petitioner raised this claim in his first motion for post-conviction relief, which was denied by the trial court. The Supreme Court of Florida affirmed the denial of this claim.

### 1. Issues One and Two

Petitioner states that counsel was ineffective by failing to request an instruction admonishing the jury not to view media coverage of the case following the guilt phase of the trial and to inquire about possible contamination of the jury by media coverage of the case after the jury returned for the penalty phase of the trial.

As discussed above, the trial court did advise the jurors, upon completion of the guilt phase and prior to sentencing, that they should not discuss the case with anyone and that they should not allow anyone to discuss the case with them; the approach adopted by the trial court was adequate. Additionally, there has been no showing that the jury was actually prejudiced by the media coverage.

Thus, these issues are without merit since Petitioner has not demonstrated that counsel's performance was unreasonable or that he sustained prejudice.

### 2. Issue Three

Petitioner states that counsel failed to provide the jurors with "any of the specifics they needed to understand the mental illness as it related to mitigation." According to Petitioner, "the jury should have heard a mental health expert discuss, at a minimum, the statutory mental health mitigating factors." Petitioner argues that Dr. Pollack and Dr. Lyons believed that Petitioner "was insane at the time of the offense," that Dr. Kirkland testified that Petitioner was delusional, and that the State's experts would have demonstrated that Petitioner suffered from mental illnesses.

Dr. Henry R. Lyons and Dr. Robert Pollack both testified at trial that, in their opinion, Petitioner was insane at the time of the shootings. (R. 1462, 1540.) Although neither Dr. Lyons nor Dr. Pollack testified at the penalty phase portion of the trial, Petitioner's counsel argued extensively, during the closing argument at the penalty phase, that evidence presented during the guilt phase showed that Petitioner suffered from mental illness:

> I persist, however, in my belief that my client is mentally ill, extremely mentally ill. I believe that is fully justified by the testimony you have heard.
>
> . . . .
>
> There was evidence that Tommy took steps not to hurt anyone not in uniform and that the man that he did kill was shooting at him, attempting to kill him.
>
> . . . .
>
> I'm not saying that justifies what he did, although Dr. Pollack, I believe, told you that he believed he was acting in self-defense.
>
> . . . .
>
> First, of all, the law of insanity in Florida, as I concede, is extremely difficult. It presents a test that is extremely difficult to meet, and we may not have met that. But a mental condition short of insanity

may still be considered in your deliberations. And I suggest that the mental condition short of insanity which put Tommy in a position where he was in the OK Corral, he was not avoiding a lawful arrest.

He was shooting at people who were shooting at him—not insane under the law by your verdict, but still under a mental condition that caused him to have a distorted picture in those frightful seconds of what was actually happening.

. . . .

There is also the pretense of moral justification established in this case. Certainly it hasn't been proved beyond a reasonable doubt. If you recall the testimony of the psychiatrists, Dr. Pollack and others talked about the psychotic paranoid state. Dr. Pollack, I believe, told you that at the time of the killing, at the time that Tommy came to this courthouse, he believed that it was wrong to kill anyone except the people that he did kill. He believed that it was wrong to kill other persons, but he believed that Officers Epperson and Shirley had, by their actions and their persecution and handling of him, I guess, in effect forfeited their right to live.

. . . .

Now, Dr. Lyons, told you that he believed that, in his expert opinion, based on his long experience, that Tommy was insane at the time he committed the act and not responsible even legally for what he did. Dr. Lyons believed that if Tommy had had the opportunity to leave the courtroom to get out of the situation, he would have done that and, further, that Tommy would not have even shot anyone who was not in uniform and might not have shot anyone at all.

His testimony as to the extreme mental disturbance is uncontradicted. The fact that we were not able to persuade you that we had crossed that line and established the defense of insanity does not mean that we did not establish a lesser degree of mental disturbance, which I suggest is uncontradicted in the evidence.

Now, my recollection of Dr. Pollack's testimony—and Dr. Pollack is the second expert witness who appeared before you.

He testified for the defense, the second psychiatrist. I'm sorry. Dr. Mara testified earlier that she had done tests that talk about—that indicate a personality disorder, and Dr. Pollack relied in part on those tests.

My recollection of Dr. Pollack's testimony is that when Tommy was approached by the bailiffs on either side of him, he felt that his space was being infringed upon, that he was being attacked, and he lashed out accordingly.

Now, that's an extreme mental disturbance, even if it falls short of the legal test of insanity.

Dr. Gutman, the state's psychiatrist, state's witness, told you that at the instance of the confrontation he was not going to do anything to the policemen. But in a state of panic, he perceived of himself as a drowning man; and he drew the gun and fired and later fired again, killing William Arnold Wilkerson.

Dr. Wilder told you that he might not have shot anyone. Just knowing that he had the guns on him and he was in a position to hurt people might have been enough to keep him from hurting anyone, shooting anyone. But then when he was challenged and had no avenue to escape, things happened rapidly. He began firing at his adversaries, the shoot out at the OK Corral, in Dr. Wilder's words. Extreme mental disturbance.

And finally Dr. Kirkland's testimony, the distinguished, learned psychiatrist who testified for the prosecution, told you that Tommy knew it was wrong to kill except in self-defense; that if he was suffering from paranoia, in a paranoid delusional state—and, again, that might fall short of an insanity defense—that he might have retreated if he had had the chance.

And what did Dr. Gutman or what did Dr. Kirkland say that goes right to the heart of this issue? And he was the state's witness, a very persuasive man. The defendant, Thomas Provenzano, has severe mental problems. He is very disturbed. He shows many symptoms of a mental disorder.

*I suggest to you that the mitigating circumstance that Tommy acted while he was under the influence of an extreme mental or emotional disturbance has been established by all the evidence, both sides of this controversy, most compelling by the state's own witnesses.*

(R. 2201, 2209, 2211, 2216, 2218–2220.) (Emphasis added).

It is readily apparent that, at the penalty phase, counsel argued extensively and thoroughly about Petitioner's mental condition and specifically pointed to the guilt phase testimony of his own experts and the State's experts. Presenting additional evidence with regard to Petitioner's mental condition would have been largely repetitive.

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052; *Gates v. Zant,* 863 F.2d 1492, 1497 (11th Cir.), *cert. denied,* 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989). Under the circumstances, counsel's performance was reasonable with regard to this matter, and, further, Petitioner has not demonstrated prejudice. Accordingly, this issue is without merit.

3. *Issue Four*

■ Petitioner states that counsel failed to present evidence of Petitioner's difficult upbringing. This issue is without merit. At the penalty phase, Petitioner himself testified and discussed his troubled background. Petitioner testified that he endured "a pretty hard upbringing"; that he never saw his father, rarely saw his stepmother, and spent most of his time with his grandparents; and that he dropped out of school at the age of fifteen years and began taking drugs and "hanging out" at pool halls. (R.2051–53.) Petitioner testified in great detail, which provided the jury with the opportunity to observe his demeanor and to listen to his life story. Further, at the guilt phase, Petition-

er's sister, Catherine Robertson, testified that their natural mother "deserted" them at a young age; that she and Petitioner were then left with their grandparents; that she and Petitioner later lived with their father and stepmother; that Petitioner did not get along with his father or stepmother; that their stepmother "didn't want [them] around"; that Petitioner did not see his natural mother again until he was twelve years old; that Petitioner quit school at the age of sixteen or seventeen; that she and Petitioner wore "second-hand" clothing; that as a youth Petitioner "took to stealing" and "got in with.... the wrong crowd"; and that Petitioner also got involved with drugs as a youth, (R. 977–80, 993–94.) Thus, at the guilt phase, Petitioner's sister also testified in great detail as to Petitioner's life history. Certainly, additional evidence as to this matter would have been largely cumulative.

Thus, the decision not to introduce further evidence as to Petitioner's difficult upbringing was reasonable trial strategy in light of the evidence that had already been presented as to the matter. Under the circumstances, counsel's performance was reasonable and not ineffective. Further, additional evidence on this matter would not have affected the outcome of the penalty phase or the sentencing, and Petitioner has not demonstrated prejudice.

### Claim XII

■ Petitioner states that, during the penalty phase, the prosecution asked him "numerous improper, inflammatory questions and made numerous improper, inflammatory arguments to the jury." For example, during the cross-examination of Petitioner by the prosecution at the penalty phase, the following colloquy occurred:

Q In fact, you don't think you got a fair trial, do you?

A No, sir; I don't.

Q In fact, you think these jurors were prejudiced against you from day one.

. . . .

Q Did you ever tell any person, Mr. Provenzano, you never had a chance with this jury?

(R. 2158–59.) Moreover, during closing argument, the prosecution argued, in relevant part, as follows:

Now, the defendant, where does he commit these specific offenses? He doesn't do it out in the street somewhere. He does it in the courthouse, the Orange County Courthouse, a public courthouse, striking at the very fabric of the community where justice is done, where equal justice before the law—

. . . .

If a collective society can't—when an innocent person such as Arnie Wilkerson's life is snuffed out, the only way that society can show the respect for the integrity of that innocent person's life is to, through the use of the death penalty, show its outrage that an innocent person in society's life has been taken.

If we don't have the death penalty in cases like this, we cheapen the lives of innocent people when they are murdered.

. . . .

The real victim, the real victim in a case like this is society itself—the fear, the apprehension, the going without that all members of society go through when you have to read and hear about this kind of conduct, this kind of outrageous assault on people by murderers like Thomas Harrison Provenzano.

Society is the one that reacts, ladies and gentlemen, because the State of Florida demands the death penalty because there is a society. The people of our state have been harmed by this criminal episode by this man, the criminal escapade, this rampage of Thomas Harrison Provenzano here in Orange County on January 10, 1984. He comes into the courthouse, and he commits the execution of Arnie Wilkerson.

We've got to lay the gauntlet down, ladies and gentlemen of the jury.

(R. 2183–84, 2197–99.)

■■■ To determine whether Petitioner is entitled to relief based on the prosecutor's comments, this Court must engage in a two pronged analysis: first, whether the prosecutor's comments were improper; and, second, whether any comments found to be improper were so prejudicial as to render the entire trial fundamentally unfair. *Davis v. Kemp*, 829 F.2d 1522, 1526 (11th Cir.1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). The trial is rendered fundamentally unfair if "there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome ... would have been different.... [A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir.1988), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990) (citations omitted) (quotations omitted). In *Drake v. Kemp*, 762 F.2d 1449, 1458 (11th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986), the Eleventh Circuit stated as follows:

Improper argument will only warrant relief if it renders a petitioner's trial or sentencing fundamentally unfair. That determination depends on whether there is a reasonable probability that, in the absence of the improper arguments, the outcome would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

(Citations omitted) (quotations omitted).

Initially, the Court determines that the prosecutorial comments identified by Petitioner were not improper. To the extent, however, that any of the prosecutor's comments were improper, when considered in the context of the entire proceeding, the prosecutor's comments in no way rendered the entire proceeding unfair. *See Gates v. Zant*, 863 F.2d 1492, 1502–03 (11th Cir.), *cert. denied*, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989) ("several of these arguments were improper.... Considering the totality of the circumstances, however, these arguments did not render the sentencing proceeding fundamentally unfair."); *Tucker v. Kemp*, 762 F.2d 1496 (11th Cir.1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986) ("while these arguments were all improper ... we are convinced that [Petitioner] has not shown a reasonable probability that their absence would have led to a different outcome. There was overwhelming evidence of guilt...."). Thus, this claim is without merit.

**1392**

### Claim XIII

Petitioner avers that "[s]ubstantial evidence in mitigation had been presented throughout the trial" and that the trial court erred by finding only one mitigating circumstance. Petitioner states that he was "clearly mentally ill, and emotionally and mentally disturbed," that there was considerable testimony at the guilt phase substantiating his mental illness, and that the trial court "was obliged to consider the guilt-innocence evidence as it may have related to mitigation."

It is apparent that the trial court did consider this type of mitigating evidence, statutorily and non-statutorily. In the sentencing order the trial court noted as follows:

> Although there was some evidence produced at trial that this Defendant may have been under extreme mental or emotional disturbance, the Court, after viewing the entire evidence in this case, finds that any mental or emotional disturbance suffered by this Defendant prior to the murder occurred many years before the murder with which he has been charged, and though he may have been angry at Officers Paul Shirley and Rick Epperson, or upset by the fact that Bailiff Harry J. Dalton had informed him that he would have to be searched while he was in Courtroom # 416 of the Orange County Courthouse, any mental or emotional disturbance suffered by the Defendant, either in the past or on the day of the commission of the crime charged, does not rise to the level of a mitigating circumstance.

(R. 3458–69.) The Supreme Court of Florida considered this issue on direct appeal and found as follows:

> In support, Provenzano cites the testimony of various psychiatrists who testified that Provenzano was suffering from some form of emotional disturbance. However, this testimony alone does not require a finding of extreme mental or emotional disturbance. As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion.... We conclude that the trial court considered all of the evidence presented, and found in its

sound discretion that it did not rise to the level of a mitigating circumstance.

*Provenzano,* 497 So.2d at 1184 (citations omitted). The Supreme Court of Florida also noted that Petitioner cited "a number of nonstatutory mitigating factors that he feels apply to this case. However, none of the factors cited are supported by the record." *Id.*

 Petitioner relies, among other cases, on *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). The instant case is distinguishable from *Parker.* In *Parker,* the state supreme court mistakenly assumed that the trial court had found no mitigating factors and then based its opinion on that mistaken assumption. In the instant case, it is clear that several statutory and non-statutory mitigating factors, with regard to mental health and other issues, were presented to the trial judge and that he was well aware of such evidence at the time of sentencing. Under both federal and Florida law, a trial judge cannot refuse to consider any mitigating evidence. *Parker,* 498 U.S. at 315, 111 S.Ct. 731. "Trial judges are presumed to know the law and to apply it in making their decisions." *Spaziano v. Singletary,* 36 F.3d 1028, 1032 (11th Cir.1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995) (quoting *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)).

In the present case, the trial judge even stated that "[t]here are no mitigating circumstances existing, either statutory *or otherwise* which would outway [sic] or outnumber the aggravating circumstances in this case...." (R. 3460.) (Emphasis added). Although there may not have been a more specific discussion as to the non-statutory mitigating factors in his sentencing order, this does not indicate that evidence of them was not considered by the judge, since at the time of the sentencing Florida law did not require the sentencing judge to set forth his findings as to non-statutory mitigating factors. *Spaziano,* 36 F.3d at 1035. From the record, it is clear that the trial court did

consider non-statutory mitigating factors.[37]

 The record establishes that the trial court did not ignore the asserted mitigating evidence; rather, it found that the evidence did not rise to the level of mitigation. Because the trial judge, as sentencing authority, possessed unbridled discretion to consider any perceived mitigating circumstances, the sentencer can assign what it deems the appropriate weight to particular mitigating circumstances. *Moore v. Balkcom*, 716 F.2d 1511, 1521–1522 (11th Cir.1983), *cert. denied*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984). The constitution "does not assign specific weights to different aggravating or mitigating circumstances." *Id.* at 1522.

Similarly, it is apparent from the record that the Supreme Court of Florida was well aware of the non-statutory mitigating factors advanced by Petitioner. On direct appeal, the supreme court specifically noted that the non-statutory mitigating factors cited by Petitioner were not "supported by the record." *Provenzano*, 497 So.2d at 1184. Given the substantial evidence in the record concerning mitigation, plus the supreme court's finding that the nonstatutory mitigating circumstances were not supported by the record, it is apparent that the Florida Supreme Court did consider non-statutory mitigating factors. Consequently, this claim must be denied.

### Claim XV

Petitioner alleges that the jury instructions provided at the penalty phase "employed a presumption of death which shifted to Mr. Provenzano the burden of proving that life was the appropriate sentence." According to Petitioner, "the jury was in essence told that death was presumed appropriate once aggravating circumstances were established, unless Mr. Provenzano proved that the mitigating circumstances out-weighed the aggravating circumstances." Petitioner also contends that there was prosecutorial argument informing the jury that "death was the appropriate sentence unless mitigating factors outweigh the aggravating factors."

 This claim was raised in the petition for writ of habeas corpus filed with the Supreme Court of Florida, and that court determined that the claim was procedurally barred because there had been no objection to the jury instruction and because the claim had not been raised on direct appeal. *Provenzano*, 561 So.2d at 547. As previously discussed, there are two exceptions to the procedural default bar: the first is the "cause and prejudice" exception; the second, which is a narrow one, is the "actually innocent" exception, alternatively known as the "fundamental miscarriage of justice" exception, used in extraordinary circumstances.

In the present case, Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The Court has reviewed the entire record and concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, this claim is procedurally barred.

 Alternatively, the Court concludes that this claim is without merit. The Court has reviewed the record and determines that neither the trial court nor the prosecutor made statements that would diminish the jury's perception of how it must reach a determination of whether the death penalty should be imposed. The trial court instructed the jury to listen to the evidence, weigh the aggravating and mitigating circumstances, and render an advisory opinion as to the applicability of the death penalty. (R.

---

**37.** Further, the trial judge stated that he considered all this evidence before passing sentence. The sentencing order provides that " [t]he Court ha[s] heard all of the evidence in this case that the jury has heard" and that the trial court had "closely considered all of the facts and evidence presented in the trial and viewed and considered the credibility of each witness that testified in his matter and ha[d] applied them to each element of aggravation and/or mitigation where such elements are properly to be applied...." (R. 3454.)

Moreover, the trial court instructed the jury at the penalty proceedings, among other matters, that 1) the advisory sentence should be "based upon the evidence that you have heard while trying the guilt or innocence of the defendant and the evidence that's been presented to you in these proceedings"; and 2) in addition to statutory mitigating factors, the jury could consider "[a]ny other aspect of the defendant's character or record, or any other circumstance of the offense." (R. 2226, 2229.)

2226–31.) Petitioner simply has failed to show that the jury instructions at the penalty proceedings or any statements by the prosecutor during closing argument at the penalty phase were constitutionally infirm.

### Claim XVI

 Petitioner contends that the trial court erred by instructing the jury at the penalty proceedings that "they could find that the crime for which the defendant was to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral and premeditated manner without any pretense of moral or legal justification." According to Petitioner, 1) the evidence presented at trial demonstrated that he suffered from a mental illness, and his "mental state pre-empted the possibility that he could objectively design a plan based in reality"; and 2) there was insufficient evidence showing a "specific intent to kill Mr. Wilkerson upon which to rest a conviction for first degree murder."

The Supreme Court of Florida addressed this claim on direct appeal:

> Heightened premeditation necessary for this circumstance does not have to be directed toward the specific victim. Rather, as the statute indicates, if the murder was committed in a *manner* that was cold and calculated, the aggravating circumstance of heightened premeditation is applicable. (Emphasis supplied.) The facts herein indicate that the manner in which Provenzano effectuated his design of death was cold, calculated and premeditated beyond a reasonable doubt.

*Provenzano*, 497 So.2d at 1183.

In *Lewis v. Jeffers*, 497 U.S. 764, 776, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), the Supreme Court stated that "in determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in *Jackson v. Virginia*,

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 ... (1979)." The inquiry set forth in *Jackson* concerns "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (citation omitted). Applying the *Jackson* standard, the Court determines that a rational factfinder could have found the aggravating circumstance. The evidence presented at trial showed that, prior to the shooting, Petitioner had purchased several weapons and had pockets sewn into the inside lining of his jacket in order to conceal the weapons; that Petitioner entered the courthouse heavily armed and with the intent to kill the officers who previously had arrested him for disorderly conduct; and that Petitioner shot at and killed Bailiff Wilkerson. This claim is without merit.[38]

### Claim XVII

Petitioner contends that the trial court improperly found the following aggravating factors: 1) that the murder for which Petitioner had been convicted was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of law; 2) that the murder for which Petitioner had been convicted was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; and 3) that in committing the murder of which Petitioner had been convicted, Petitioner knowingly created a great risk of death to many persons.

#### 1. Issue One

 Petitioner states that the trial court improperly found as an aggravating factor that the murder for which he had been convicted was committed to disrupt or hinder

---

**38.** The Court also finds that the jury was properly instructed as to this aggravating circumstance

and that the instruction was not unconstitutional.

the lawful exercise of any governmental function or the enforcement of law. According to Petitioner, he was "suffering from a major mental illness[,] ... [which] flies in the face of any rational analysis to say that the act was committed to hinder a governmental function." The Supreme Court of Florida found that this aggravating factor was appropriate because Petitioner "intended to disrupt his trial, thus hindering one of the most basic government functions." *Provenzano*, 497 So.2d at 1183.

Applying the *Jackson* standard, the Court determines that a rational factfinder could have found the aggravating circumstance. The evidence presented at trial showed that Petitioner entered the courthouse heavily armed and with the intent to kill the officers who previously had arrested him for disorderly conduct. Therefore, Petitioner intended to disrupt his trial, which would thereby hinder one of the most basic government functions. The Court also finds that the jury was properly instructed as to this aggravating circumstance and that the instruction was not unconstitutional.

### 2. Issue Two

■ Petitioner states that the trial court improperly found as an aggravating factor that the murder for which he had been convicted was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The Supreme Court of Florida found that this aggravating factor was appropriate because "[t]he fact that Provenzano murdered Wilkerson to avoid his lawful arrest for the attempted murder of Dalton supports the finding that the murder was committed to avoid lawful arrest." *Provenzano*, 497 So.2d at 1184.

Applying the *Jackson* standard, the Court determines that a rational factfinder could have found the aggravating circumstance. The evidence presented at trial showed that Petitioner shot and wounded Bailiff Dalton; that Petitioner then shot and wounded Correctional Officer Parker; and that, in order

to avoid his lawful arrest for the shooting of Bailiff Dalton and Correctional Officer Parker; Petitioner shot and murdered Bailiff Wilkerson. Therefore, Petitioner murdered Wilkerson to avoid his lawful arrest for the attempted murder of Dalton and Parker. The Court also finds that the jury was properly instructed as to this aggravating circumstance and that the instruction was not unconstitutional.

### 3. Issue Three

Petitioner states that the trial court improperly found as an aggravating factor that in committing the murder of which he had been convicted, he knowingly created a great risk of death to many persons.

This issue was raised for the first time in the petition for writ of habeas corpus Petitioner filed with the Supreme Court of Florida. The supreme court found that the claim was procedurally barred.[39] Consequently, this issue is procedurally barred in this Court because the last state court rendering a judgment in Petitioner's case clearly and expressly stated that its judgment rested on the procedural bar. Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The Court has reviewed the entire record and concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar and that this claim is procedurally barred.

■ Alternatively, this issue is without merit. Applying the *Jackson* standard, the Court determines that a rational factfinder could have found the aggravating circumstance. The evidence presented at trial showed that Petitioner entered the courthouse, which contained a large number of the public and courthouse employees, heavily armed and shot several individuals. The shootings occurred in the courthouse and at a time when the courthouse war occupied by a large number of the public and courthouse employees. Therefore, Petitioner knowingly

---

**39.** The Supreme Court of Florida found that the challenge to this aggravating factor and to three other aggravating factors was procedurally barred because these issues were "either rejected or not argued on direct appeal." *Provenzano*, 561 So.2d at 547.

created a great risk of death to many persons. The Court also finds that the jury was properly instructed as to this aggravating circumstance and that the instruction was not unconstitutional.

Any of Petitioner's allegations not specifically addressed herein have been determined to be without merit.

### IV. *CONCLUSION*

The Court determines that the petition must be denied and that this case must be dismissed.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Petition for Writ of Habeas Corpus filed by Petitioner, Thomas Harrison Provenzano, is **DENIED,** and this case is **DISMISSED WITH PREJUDICE.**

2. The Clerk of the Court shall enter judgment dismissing this action and is directed to close this case.